State *ex rel.* Comm'r Ins. v. Custard, 2010 NCBC 6.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 4622

STATE OF NORTH CAROLINA, on
Relation of its Commissioner of Insurance,
AS LIQUIDATOR OF COMMERCIAL
CASUALTY INSURANCE COMPANY
OF NORTH CAROLINA,

                     Plaintiff,

    v.

A. RICHARD CUSTARD, by and through
his Guardian ad Litem; WENDY J.
CUSTARD; E. NIMOCKS HAIGH; and
DELTA INSURANCE SERVICES, INC.,

                     Defendants.

**ORDER & OPINION**

{1}    This matter comes before the Court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. After considering submissions by counsel and hearing oral arguments, the Court hereby GRANTS Defendants' Motion for Summary Judgment.

> *Nelson Mullins Riley & Scarborough, LLP by Joseph W. Eason, Christopher J. Blake, and Leslie Lane Mize for Plaintiff.*
>
> *Hunton & Williams LLP by Steven B. Epstein and Bryan A. Powell for Defendants.*

Tennille, Judge.

INTRODUCTION

{2}    The pending Motion requires an exploration of the contours and role of "good faith" in North Carolina corporate governance law at a time when the mismanagement of risk at financial institutions by some corporate officers has almost destroyed our economy. The case arises in the context of a financial institution—an insurance company—where (1) risk management is an essential,

fundamental element of the business and (2) mismanagement of risk can impact not only shareholders and other corporate constituents but also innocent policyholders.

{3} The current Motion poses significant questions concerning the duties of officers and directors and to whom those duties are owed and the standards of review applied by the courts. It is the first case to interpret North Carolina's Risk-Based Capital Requirements and their interrelationship with corporate law. N.C. Gen. Stat. §§ 58-12-2 to -70 (2009). It echoes familiar refrains in these economic times: reliance on outside financial experts—actuaries—whose choice of risk assessment methods proved inadequate to protect against the financial loss which occurred and a regulatory agency whose oversight did not prevent the failure.

{4} This case requires the Court to explore (in the context of an insolvent insurance company) the defining principles that fairly distinguish between director and officer conduct that involves (1) a breach of the duty of loyalty that should be remediable by an award of monetary damages and (2) an exculpable or indemnifiable breach of the duty of care.

{5} For the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment with respect to the breach of fiduciary duty claims asserted in the Amended Complaint. The Court will address the severance payment claim asserted against Defendant E. Nimocks Haigh ("Haigh") separately in Part IX.

I.

{6} This action was filed in Wake County Superior Court on March 31, 2006. Defendants A. Richard Custard ("Mr. Custard"), Wendy J. Custard ("Mrs. Custard"), and Delta Insurance Services, Inc. ("Delta") filed the Notice of Designation on May 2, 2006. This action was designated a mandatory complex business case by Order of the Chief Justice of the Supreme Court of North Carolina dated May 3, 2006, and was assigned to the undersigned Chief Special Superior Court Judge for Complex Business Cases by Order dated May 8, 2006.

{7} On January 2, 2007, the Court granted Plaintiff leave to file an Amended Complaint. Shortly thereafter, Plaintiff filed a Motion for Appointment of Guardian

Ad Litem for Mr. Custard. The Court entered an Order under seal on June 18, 2007, which appointed Robert E. Soby to serve as Mr. Custard's guardian ad litem.

{8} Defendants filed a Motion for Summary Judgment on July 15, 2009. On September 1, 2009, Plaintiff filed a Memorandum in Response and Opposition to Defendants' Motion. Defendants filed their reply brief on September 21, 2009, and the Court heard oral arguments on October 22, 2009. Many facts are undisputed. Where facts are disputed the Court will so indicate and determine their materiality.

{9} The Amended Complaint is based upon the premise that Mr. Custard, Mrs. Custard, and Haigh (collectively, the "individual Defendants") directed the business of Commercial Casualty Insurance Company of North Carolina ("CCIC") in such a way as to promote the best interests of Custard Insurance Adjusters ("CIA") and in disregard of the interests of CCIC shareholders and policyholders. Plaintiff emphasized the fact that Mr. and Mrs. Custard (the "Custards") owned a majority interest in both companies. In essence, the North Carolina Department of Insurance ("NCDOI" or the "Department") asserted that the individual Defendants breached their fiduciary duty by selling insurance through CCIC to provide a source of claims (losses) for CIA to adjust without regard to the solvency of CCIC. Not surprisingly, there does not appear to be any evidence to support what is, on its face, an irrational theory.

{10} The NCDOI did not pursue this conflict of interest theory on summary judgment. Rather, for the first time, the NCDOI based its theory of liability on allegations that the individual Defendants showed a lack of good faith in (1) filing CCIC's monthly reports with the NCDOI and (2) continuing to sell a high volume of artisan insurance policies in California after seeing that losses on those policies were coming in at higher than expected rates. Because the Court grants summary judgment on other grounds, it need not address the fairness issues raised by this shift in theory.[1] Defendants have made and preserved their argument that

---

[1] Plaintiff never sought to amend its Complaint or discovery responses to assert this new theory of liability.

fundamental fairness should prohibit a plaintiff from asserting a totally new theory of liability after discovery has closed in response to a motion for summary judgment.

## II.

## A.

{11}   It is helpful to put the present controversy in the context of overall insurance regulation and understand the competing forces that exist within that regulatory scheme.  The current regulatory scheme that exists in North Carolina and most other states revolves around risk-based capital requirements.  Risk-based capital regulatory practices grew out of insurance company insolvency concerns in the late 1980s and early 1990s.  Scott E. Harrington & Gregory R. Niehaus, *Risk Management and Insurance* 116 (2d ed. 2004).[2]  During that time about one percent of insurance companies failed each year.  *Id.*

{12}   Insurance company insolvency can result from a number of factors. Management can make errors in judgment about the risks associated with the policies being written or the adequacy of the premiums being charged to cover the risks.[3]  Management also can make bad investment decisions with the insurance company's capital.[4]  Insolvency also can result from management fraud, which usually involves either deliberately underreporting claims liabilities or deliberately overstating asset values.

{13}   Protecting against insurer insolvency is costly.  The costs can arise from insurers taking less risk by writing fewer policies or refusing to cover certain types of liability.  Solvency regulation also adds to costs.  For example, increasing the amount of capital required increases "the amount of premiums needed to provide a

---

[2]  This work is particularly helpful in understanding the economics of insurance and the basis for insurance regulation by state agencies.

[3] The major determinants of insurance premiums charged by an insurance company are: (1) expected claim costs, (2) investment income, (3) administrative costs, and (4) fair profit loading.  *Id.* at 135 fig.8.1.  The most significant determinant by far is expected claim costs.  *Id.* at 135.  Rational companies will not knowingly charge premium rates which are less than their expected claim costs. Investment income can sometimes cover a shortfall, but accurate setting of premium rates is critical to a successful insurance company.

[4] For example, an insurance company that invested heavily in real estate thinking it was a safe long-term investment might find its capital severely impaired when a real estate bubble bursts.  Other large and unexpected reductions in capital also can cause insolvency.

given amount of coverage."[5]  *Id.*  In light of these costs, an insolvency-proof insurance system probably is not economically feasible.

{14}   There were some lessons to draw from the failures of property and liability companies in the late 1980s.  Harrington and Niehaus summarize them as follows:

> Many property-liability insurers that failed during the 1980s wrote large amounts of business liability insurance, including products liability, environmental liability, and professional liability insurance (e.g., for physicians, architects, and engineers).  These insolvencies were associated with much higher claim costs than the insurers originally reported on their financial statements.  Evidence suggests that a large component of the increase in claim costs was probably unexpected in many cases; in other words, the actual costs were significantly higher than could reasonably have been expected when the insurers wrote the business and initially reported estimates of claim costs.
>
> Conversely, it has been argued that some of these insurers deliberately wrote large amounts of business at prices that they knew to be too low in comparison to expected claim costs, either because they had inadequate incentives to be safe or in an attempt to generate cash and buy time after they began to experience difficulty.  These insurers also are alleged to have hidden their inadequate prices and capital by deliberately understating their estimated liabilities and using questionable (if not completely phony) reinsurance arrangements. . . .
>
> Some property-liability insurer insolvencies during the mid- to late 1980s probably were influenced by low prices during the "soft market" for business liability insurance during the early 1980s.  A large increase in market interest rates in the late 1970s and early 1980s also may have contributed to some of those insolvencies.  Higher interest rates substantially reduced the market value of bonds held by many insurers.  Some companies might have been weakened to the point that they engaged in excessively risky behavior in the hope of getting lucky and avoiding insolvency.  (This behavior sometimes is known as "going-for-broke" or "gambling for resurrection.")

*Id.* at 118.  Those opposing contentions are echoed in this case.

B.

{15}   In the absence of an insolvency-proof system, consumers must look to other protections.  One protection is the use of solvency ratings.  The leading financial

---

[5] The phenomenon results from the higher taxes paid on income from increased capital.  *See id.*

ratings companies who rate insurance companies are Moody's Investors Service, A.M. Best Company ("AM Best"), Duff & Phelps Corporation, and Standard & Poor's Financial Services.

{16}   In this case, AM Best provided solvency ratings for CCIC.  Although the quality of agency ratings has been questioned following the subprime meltdown, solvency ratings still enjoy widespread use and are considered when selecting an insurance company.  *See* Harrington & Niehaus, *supra*, at 119.  Therefore, an insurance company "could experience a significant reduction in sales to business policyholders if it were to lose a high rating." *Id.*  CCIC had an A- rating but was in danger of losing that rating, as will be more fully discussed in Part III.C.  The significance of such a downgrade is shown by the fact that eighty-five to ninety percent of property-liability companies maintain an AM Best rating of A- or better. *Id.* at 121.  Because insolvencies can be caused by unpredictable adverse events and because rating companies sometimes err in their assessments, solvency ratings provide little protection to policyholders.  They can, however, affect the market for an insurance company's product.

C.

{17}   Another outgrowth of the solvency problems of insurance companies in the late 1980s was the creation of risk-based capital ("RBC") requirements for adoption by states.[6]  These model requirements were conceived by the National Association of Insurance Commissioners ("NAIC") and adopted by North Carolina in Article 12, Chapter 58 of our General Statutes.  RBC requirements are a form of legislated solvency monitoring that provide for specific steps to be taken by the Commissioner of Insurance ("Commissioner") when significant target capital events occur.

> The NAIC's property-liability RBC formula encompasses four major risk categories: (1) asset risk (the risk of issuer default and market value declines); (2) credit risk (e.g., the risk that reinsurance

---

[6] Many states, including North Carolina, also created state guaranty systems that provided funds for policyholders and claimants whose claims could not be paid by insolvent insurance companies. *See, e.g.*, Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1 to -130 (2009).  At this point, there is no evidence before the Court with respect to the amount, if any, that North Carolina's state guaranty system may be required to pay as a result of the liquidation of CCIC.

and other receivables will prove to be uncollectible); (3) underwriting risk (the risk that prices and reported claim liabilities will be inadequate compared to realized claim costs); and (4) miscellaneous "off-balance sheet" risks, such as the risk associated with rapid premium growth. . . .

. . . The important point is that in states that have adopted the NAIC's model RBC law, each insurer must calculate a dollar figure called its RBC. This figure is higher for insurers that take on more risk. An insurer's actual capital is then compared to its RBC.

Harrington & Niehaus, *supra*, at 125. This type of insurance solvency regulation places a premium on accurate information. If an insurer's actual capital falls below specified percentages of its RBC, regulators can take the actions shown below in Table 1:

Table 1: Risk-Based Capital Thresholds for Insurance Companies

| RBC Level | Insurer Event | Regulatory Action |
|---|---|---|
| Company Action | Between 150 and 200% of formula RBC | Company must file plan with insurance commissioner explaining the cause of deficiency and how it will be corrected |
| Regulatory Action | Between 100 and 150% of formula RBC | Commissioner must examine insurer and take corrective action as necessary |
| Authorized Control | Between 70 and 100% of formula RBC | Commissioner has legal grounds to rehabilitate or liquidate the company |
| Mandatory Control | Less than 70% of formula RBC | Commissioner must take over the company |

SOURCE: Harrington & Niehaus, *supra*, at 126 tbl.7.3.

{18}   Under RBC requirements, an insurer's actual capital or its "surplus" is compared to its RBC. Surplus equals assets minus liabilities for unearned premiums and unpaid claims.[7] In order to improve its ratio of surplus to RBC, an insurance company can take one or more of the following steps: (1) raise more

---

[7] This case is focused on the liability side of the equation. In other words, the allegations center on understating liabilities, rather than overstating asset values.

capital, (2) write less coverage, or (3) reinsure more of its business. We will see the implications of all three options in the factual scenario set out in Part III.C.

{19} RBC requirements play an important role in balancing solvency risks and keeping insurance costs at acceptable levels. By creating a stepped approach, the RBC thresholds attempt to reduce costs by letting management rather than state regulators run insurance companies until liquidation becomes necessary.

{20} RBC law frames two issues before the Court: Plaintiff's breach of fiduciary duty claims and Plaintiff's severance payment claim. The Court will address these two issues later in Parts VII and IX.

III.

{21} The Court now turns from the general industry and regulatory control to the specific facts in this case. Part A will identify the parties; Part B will provide a historical overview of the Company; and Part C will delve deep into the Company's corporate management and financial reporting.[8] In Part D, the Court will consider whether there are material facts in dispute.

A.

{22} The State of North Carolina on relation of its Commissioner of Insurance, as Liquidator ("Plaintiff" or "Commissioner"), brought this action on behalf of CCIC and its creditors and policyholders under sections 58-30-120(a)(12) and (a)(13) of the North Carolina General Statutes.

{23} Delta was a corporation organized under the laws of the State of Georgia in 1988. Prior to the entry of the 2006 Order of Rehabilitation, Delta owned all outstanding shares of CCIC stock. Mr. Custard owned a controlling interest in Delta. He owned 80% of Delta's stock. (Allen Dep. Ex. 6 at 13.) As for the remainder of Delta's stock, Haigh owned 5%, Mrs. Custard owned 5%, and two of the Custards' relatives owned 10%. (Allen Dep. Ex. 6 at 13.)

{24} The Custards also owned and controlled CIA, a company that adjusted property and casualty insurance claims for companies nationwide. (Am. Compl. ¶

---

[8] Throughout this opinion, "CCIC" and "the Company" will be used interchangeably.

10.)  They owned 100% of CIA's stock.  (W. Custard Dep. Ex. 20.)  CIA performed claims handling services for the majority of CCIC's claims.  (Soby Aff. ¶ 4.)  The California artisan claims were handled by CIA's Las Vegas office.  (Reed Aff. ¶ 15.)

{25}  Mr. Custard is a resident of the State of Georgia.  He served as chief executive officer of CCIC and president of both CIA and Delta.

{26}  Mrs. Custard, wife of Mr. Custard, is also a resident of the State of Georgia.  She served as secretary of CCIC and Delta.

{27}  Haigh is a resident of Iredell County, North Carolina.  From 1992 until March 2003, he served as CCIC's president and chief operating officer.  During that time, he also served as executive vice president and treasurer of Delta.

{28}  The individual Defendants served as members of the board of directors at both CCIC and Delta.

B.

{29}  CCIC was organized under the laws of the State of Georgia in 1988.  (Am. Compl. ¶ 9.)  At that time, the name of the Company was Commercial Casualty Company of North Georgia.  (Hoerl Dep. 344:2–6.)  Delta was the sole shareholder. (Am. Compl. ¶ 9.)

{30}  At first, CCIC primarily wrote professional liability insurance policies for environmental consultants in Florida.  (Am. Compl. ¶ 13.)  When the profitability of its environmental business declined in 1998, CCIC decided to expand into California and switch its policy focus to liability insurance for small contractors and tradesmen ("artisans").[9]  (Am. Compl. ¶¶ 15, 18.)  For its California artisan business, CCIC adopted another insurance company's underwriting guidelines, rates, and forms as its own.  (Am. Compl. ¶¶ 20–21.)  The Court takes judicial notice of the fact that California experienced a construction boom in the years at issue (1998–2002), thus expanding the potential to sell artisan insurance in that state.  The California

---

[9] Artisan insurance is a form of general liability insurance that provides coverage to small businesses "that contract skilled services to the public or other business."  (Allen Dep. Ex. 6 at 17.)  This class would include carpenters, electricians, masons, painters, plumbers, and other similar trades.  (Allen Dep. Ex. 6 at 17.)  Artisan contractors usually are "subcontractors on larger jobs" who work under a general contractor.  (Allen Dep. Ex. 6 at 17.)  They rarely perform "subcontract work themselves." (Allen Dep. Ex. 6 at 17.)

Department of Insurance ("CADOI") controlled the rates CCIC could charge for insurance issued in California. *See* Cal. Ins. Code § 11737 (West 2009).

{31}   In 2000, CCIC acquired an automobile liability insurance business based in Charlotte, North Carolina. (Am. Compl. ¶ 34.) The Company planned on growing its non-standard automobile line and wanted a larger presence in North Carolina. (Jackson Dep. Ex. 19.) These plans changed in 2002 when the Company decided to significantly reduce its writings in non-standard auto and focus on its California artisan business instead. (Jackson Dep. 241:6–16.)

{32}   CCIC redomesticated in the State of North Carolina in 2001 and became subject to NCDOI regulations. (Am. Compl. ¶¶ 2, 39.) Financial considerations drove this decision. (Allen Dep. 685:13–15.) North Carolina offered a lower premium tax rate than Georgia. (Haigh Aff. ¶ 25.) This decision saved the Company $1.5 million in out-of-state premium taxes in 2002. (Haigh Aff. ¶ 25.)

{33}   During 2001 and 2002, CCIC's growth outperformed the Company's ability to generate policyholder surplus. (Giesecke Dep. Ex. 60 at 2.) In addition, management's efforts to secure outside capital investments were not successful. (Giesecke Dep. Ex. 60 at 2.) During this time, management took a number of steps to improve overall capitalization: they sought rate increases, eliminated unprofitable writings, and obtained more reinsurance. (Haigh Aff. ¶¶ 48, 52, 68.) Nonetheless, profitability continued to decline and in early 2003 CCIC ceased operations nationwide. (Am. Compl. ¶¶ 72, 74.)

{34}   On April 2, 2004, CCIC was declared insolvent. (Am. Compl. ¶ 76.) The Wake County Superior Court entered an Order of Liquidation against CCIC and appointed Plaintiff as liquidator. (Trendel Aff. ¶ 2.) The parties dispute the amount by which CCIC's liabilities will exceed its assets. Results from discovery, particularly detailed actuarial studies, have not yet been submitted to the Court.[10]

---

[10] Despite the fact that six years have now passed since CCIC wrote any policies, the actuaries hired by both sides appear to be millions of dollars apart in their assessment of CCIC's future liabilities. Only time will resolve the conflicting opinions of the actuaries. It has been argued to the Court that this wide divergence results from vagaries in California law that make it difficult to know when a statute of limitations has run.

C.

{35}   Haigh managed CCIC's daily operations.  (Haigh Aff. ¶ 9.)  In addition to Haigh, CCIC's core management team consisted of the following individuals: Bill Allen ("Allen"), Buck Giesecke ("Giesecke"), and Mike Reed ("Reed").  (Haigh Aff. ¶ 10.)  As chief financial officer, Allen prepared financial statements, maintained the books, and oversaw the accounting department.  (Haigh Aff. ¶ 11.)  Giesecke, vice president of marketing, oversaw CCIC's underwriting department as well as the preparation of form and rate filings with state insurance departments.  (Giesecke Aff. ¶ 4.)  Reed oversaw claims management.  (Reed Aff. ¶ 3.)

{36}   Haigh consulted with his management team regularly about important decisions.  (Haigh Aff. ¶ 10.)  Haigh is the only member of the management team whom Plaintiff names as a defendant.

{37}   Haigh kept Mr. Custard abreast of CCIC's day-to-day operations.  (Haigh Dep. 327:1–16.)  However, he did not need Mr. Custard's approval when making everyday management decisions.  (Haigh Dep. 327:6–16.)  Mr. Custard did not prepare CCIC's financial statements.  (Allen Dep. 465:15–19.)  He relied on management to determine the numbers, including the Company's loss estimates.  (Allen Dep. 504:14–25, 505:1.)

{38}   Mrs. Custard "let the people who had the expertise run" the day-to-day operations.  (W. Custard Dep. 113:12–13.)  She kept herself "aware of what was going on through [her] husband."  (W. Custard Dep. 51:21–24, 52:7–9.)  Like her husband, she did not participate in the preparation of the financial statements and when she signed them, she relied on "the people that prepared them" with regard to the truth and accuracy of the statements.  (W. Custard Dep. 102:5–7, 112:15–21.)

{39}   Fred Hoerl ("Hoerl") worked as CCIC's internal actuary from 2000 until 2003.  (Hoerl Aff. ¶ 2.)  He prepared rate filings and quarterly internal loss reserve analyses for various CCIC insurance products, including the California artisan policies.  (Hoerl Aff. ¶¶ 4, 6, 11.)

{40}   CCIC's annual financial statements were reviewed by Ernst & Young ("E&Y"), a large, outside accounting firm that provides auditing and actuarial services. (Allen Aff. ¶ 3.)

{41}   The following timeline sets forth and describes the corporate management and financial reporting in the years leading up to CCIC's collapse. For a detailed account of the actuarial evidence in support, refer to Appendices A through D.[11]

- **May 16, 2001**:  CCIC increased its reinsurance for the California artisan business from a $50,000 to a $100,000 retention level. (Haigh Dep. Ex. 16.) This move increased its exposure to the California market.

- **June 12, 2001**:  CCIC filed a Petition for Redomestication with the NCDOI to become a North Carolina domiciled insurance carrier. (Haigh Aff. ¶ 22.) This regulatory move increased policyholder surplus by saving CCIC $1.5 million in out-of-state premium taxes in 2002. (Haigh Aff. ¶ 25.)

- **June 13, 2001**:  Hoerl prepared a quarterly loss reserve analysis which estimated that the 2001 losses at three months were "exceptionally large in comparison to previous years." (Haigh Dep. Ex. 29 at 1.) He concluded that reliance on non-California data to select loss development factors for the California artisan business "could be understating" the development in California. (Haigh Dep. Ex. 29 at 2.) He also suggested that such reliance "be watched closely as accident year 2001 develops." (Haigh Dep. Ex. 29 at 2.)

- **June 14, 2001**:  AM Best, a financial strength rating agency that measures an insurance company's ability to pay claims, sent Haigh a formal notice of CCIC's financial-strength rating. (Haigh Dep. Ex. 9.) Although CCIC received an A- (Excellent) rating, the notice stated that the Company's "significant premium growth ha[d] resulted in high gross underwriting leverage and significant reinsurance dependence given capital limitations."

---

[11] The timeline in this case is significant. For that reason, the Court has used abbreviated descriptions supported by detailed Appendices in hopes that the reader does not get lost in actuarial complexity and jargon. It is important to note that the timeline begins within the applicable statute of limitations. The Court has heretofore dismissed claims of breach of fiduciary duty arising prior to March 1, 2001 based on the statute of limitations. *See State ex rel. Long v. Custard*, No. 06-CVS-4622 (N.C. Super. Ct. Aug. 8, 2007).

(Haigh Dep. Ex. 9 at 6608.) The notice also stated that AM Best would "closely monitor future capitalization to ensure that business growth [was] adequately supported." (Haigh Dep. Ex. 9 at 6608.) Loss of its A- rating would adversely impact CCIC's business.

- **July 18, 2001**: Mr. Custard stated in a letter to Haigh that "low profitability" was "a sign of positive transition" and that CCIC was "giving 110% to move beyond it to growing profitability" in California. (Haigh Dep. Ex. 20.)

- **August 7, 2001**: In a letter to Haigh, Mr. Custard stated that even though "bottom line profits" were down, "the position of the company and the top line momentum [we]re better than they ha[d] ever been." (Haigh Dep. Ex. 22.)

- **October 1, 2001**: Haigh recognized that CCIC needed more capital to support its growth and began capital raising efforts. (Allen Dep. Ex. 5.) Part of his efforts included obtaining a company valuation (the "Geneva Report"). The Geneva Report valued the Company at between $17 and $20 million. (W. Custard Dep. Ex. 28 at 1.) The Geneva Report also stated that "[w]ithout an increase in profitability or an injection of capital by the primary shareholder, the Company may have to curtail its aggressive expansion plans or risk being downgraded by AM Best." (W. Custard Dep. Ex. 28 at 3.)

- **October 22, 2001**: Hoerl prepared a reserve analysis comparing CCIC's 2001 losses (through September) to its 2000 year-end losses. (Allen Dep. Ex. 11.) In his executive summary, Hoerl stated that the changes in the loss ratios for the California artisan business were substantial and that it "may have additional adverse development each quarter as the numbers develop." (Allen Dep. Ex. 11 at 1; *see also infra* App. A.)

- **December 5, 2001**: CCIC submitted a California rate filing with the CADOI seeking a 20% rate increase for its remodeling class. (Giesecke Aff. ¶ 8; Haigh Aff. ¶ 28.) This increase was sought to increase premium volume, to decrease the number of policyholders, and to decrease CCIC's exposure to losses. (Haigh Aff. ¶ 28.)

- **December 19, 2001**: The NCDOI granted CCIC's Petition for Redomestication and became the Company's primary source of regulation. (Haigh Aff. ¶ 24.)

- **December 20, 2001**: Giesecke decided to apply a 15% "bad risk" surcharge on all new business and renewals written until the CADOI approved the CCIC rate filing. (Giesecke Aff. ¶¶ 14–15.) This decision was intended to increase CCIC's profitability and policyholder surplus. (Haigh Aff. ¶¶ 26, 31.)

- **January 1, 2002**: At the beginning of 2001, CCIC's policyholder surplus stood at $15.213 million. (W. Custard Dep. Ex. 12 at 1.) However, over the course of the year, this surplus dwindled to $4.969 million. (W. Custard Dep. Ex. 12 at 1.) When Haigh and Giesecke met with CCIC brokers in California, Haigh agreed that the surplus ratio was too high but "was confident that [CCIC] would have sufficient capital and surplus" to offset that ratio by mid-year. (Maucere Dep. 27:6–22, 30:5–11.)

- **January 22, 2002**: Giesecke instructed CCIC's California agents to stop using schedule rating credits. (Giesecke Aff. ¶ 18.) This decision was intended to increase CCIC's profitability and policyholder surplus. (Giesecke Aff. ¶ 17.)

- **February 7, 2002**: Hoerl completed his initial reserve analysis for CCIC's 2001 annual statement based on CCIC's 2001 year-end loss data. (Hoerl Aff. ¶ 16.) He based his analysis on CCIC's California and non-California loss experience—applying a 50% weight to each.[12] (Hoerl Aff. ¶ 23.) He found that the Company's loss experience in California had a "unique development pattern" that was "steeper and more rapid than the development pattern" for non-California losses. (Hoerl Aff. ¶ 17; *see also infra* App. B.) For example, the Company's year-end loss estimates for California increased from 46% in 2000 to 90.7% in 2001. (Giesecke Dep. 149:11–16.) Hoerl concluded that the California losses had "deteriorated significantly" in 2001. (Hoerl Aff. ¶ 22.)

---

[12] Hoerl assumed that the CCIC's California experience and non-California experience "each represented about a 50% influence on the [Company's] combined LDFs." (Hoerl Dep. Ex. 8 at 1.)

- **February 20, 2002**:  The CADOI approved a 16.2% rate increase in response to CCIC's December rate filing application, which requested a 20% increase. (Giesecke Aff. ¶ 21.)

- **February 28, 2002**:  CCIC filed its 2001 annual statement with the NCDOI. Management selected and booked lower loss ratios than Hoerl's analysis would suggest "based upon their belief that California losses would develop more similarly to CCIC's non-California artisan losses."  (Hoerl Aff. ¶ 20.)

Table 2:  Loss Ratio Estimates – Management

| Accident Year | Hoerl's Estimates for 2001 Reserve Analysis | Management's Selections for 2001 Annual Statement |
|---|---|---|
| 2000 | 82.1% | 56.7% |
| 2001 | 69.9% | 55.8% |

SOURCE: Hoerl Dep. Ex. 58 at 1856; Allen Dep. Ex. 12.

Management decided to base its loss ratio estimates for the California artisan business on the Company's historic "rest of country" loss experience because CCIC's loss experience in California was immature.  (Allen Aff. ¶¶ 10–11.) Management also relied on E&Y's preliminary actuarial analysis, which discounted Hoerl's use of California loss data.  (Allen Aff. ¶ 14; Haigh Dep. 454:18–22; *see also infra* April 30, 2002 timeline entry.)

- **March 22, 2002**:  CCIC imposed a new underwriting restriction that reduced the maximum allowable work for the remodeling class from 40% to 25% for new and renewal business. (Giesecke Dep. Ex. 31 at 1.)  This restriction was intended to increase CCIC's profitability and policyholder surplus.  (Haigh Aff. ¶ 40.)  CCIC also decided to stop writing coverage for physical automobile damage and limit its automobile market to North Carolina.  (Haigh Aff. ¶ 41.) This decision was based on CCIC's high loss experience with this line outside of North Carolina.  (Haigh Aff. ¶ 41.)

- **March 31, 2002**:  CCIC entered a quota share reinsurance agreement.  (Allen Dep. Ex. 77.)  This agreement "reduce[d] CCIC's net leverage" by transferring

25% of all future writings from Company books to the books of a reinsurer. (Allen Aff. ¶ 47.)  CCIC entered this agreement to address its "higher-than-anticipated production" and to control its net leverage.  (Allen Aff. ¶ 48.)

- **April 30, 2002**:  E&Y delivered a Reserve Study to CCIC.  (Hoerl Aff. ¶ 21.) Although E&Y based its Reserve Study on the same 2001 year-end loss data that Hoerl used in his analysis, E&Y reached a different conclusion.  (Hoerl Aff. ¶ 22.)  E&Y concluded that the Company's California artisan business losses remained "largely unchanged" in 2001.  (Hoerl Aff. ¶ 22.)

Table 3:  Loss Ratio Estimates for 2001 – E&Y

| Accident Year | Hoerl's Estimates | E&Y's Estimates |
| --- | --- | --- |
| 1999 | 108.6% | 98.0% |
| 2000 | 82.1% | 56.7% |
| 2001 | 69.9% | 55.8% |
| All Years | 79.7% | 62.5% |

SOURCE: Hoerl Dep. Ex. 58 at 1856; Hoerl Aff. ¶¶ 16, 18.

E&Y based its loss ratio estimates for the California artisan business on CCIC's loss experience in other states.  (Evans Dep. Ex. 5.)  As a result, the Reserve Study showed lower loss ratios estimates than Hoerl's analysis had shown.  (Hoerl Aff. ¶ 18–19; Hoerl Dep. Ex. 58 at 1856; *see also infra* App. C.)

- **May 13, 2002**:  CCIC filed its first quarter financial statement with the NCDOI.  (Allen Aff. ¶ 22.)  This quarterly statement revealed no material change in the Company's loss experience in California.  (Allen Aff. ¶ 23.)

- **May 17, 2002**:  Haigh sent Giesecke an email about seeking a California rate increase.  (Haigh Dep. Ex. 43.)  He stated that CCIC's production was "far beyond expectations" and "running ahead of surplus."  (Haigh Dep. Ex. 43.)

- **May 23, 2002**:  Dale Evans ("Evans"), an actuary for the NCDOI, reviewed the E&Y Reserve Study.  (Evans Dep. Ex. 2 at 27239.)  He "concur[red] in all respects with the findings and conclusions" and agreed that E&Y's methods

were "appropriate and proper." (Evans Dep. Ex. 2 at 27241.) Evans also reviewed E&Y's decision to apply CCIC's non-California loss experience to its California artisan business. (Evans Dep. 135:21–25, 136:1–4.) He concluded that "the selections made by the opining actuary appeared to evidence good judgment and to be free from bias." (Evans Dep. Ex. 2 at 27240.)

- **June 11, 2002**: Giesecke prepared a memorandum that compared expiring premium rates to renewal premium rates in light of management's rate and underwriting changes. (Giesecke Aff. ¶ 28.) He determined that the changes would result in a 53.4% increase in the amount of premium CCIC received from its California artisan business. (Giesecke Aff. ¶ 28.) Giesecke believed this increase would improve CCIC's profitability. (Giesecke Dep. 173:10–25.)

- **June 14, 2002**: AM Best downgraded CCIC's A- (Excellent) financial-strength rating to a B++ (Very Good). (Haigh Dep. Ex. 143.) AM Best's initial A- report stated that although overall capitalization was "not as strong" as it had been in years past, it did "support the current premium volume." (Haigh Dep. Ex. 51 at 25979.) However, the A- report also stated that the "aggressive premium growth in recent years and projected growth presents long-term uncertainty related to the profitability of [CCIC's new California artisan business]." (Haigh Dep. Ex. 51 at 25978.) AM Best decided to lower the rating because it predicted that "[t]he growth in net premiums, net loss LAE reserves and reinsurance recoverables in conjunction with modest projected surplus growth" would "strain the capital base." (Haigh Dep. Ex. 143.)

- **June 21, 2002**: CCIC submitted a rate filing to the CADOI seeking a 43.4% rate increase for its California artisan business. (Hoerl Aff. ¶ 30.) Hoerl prepared this California rate filing based on the Company's 2001 year-end loss data. (Hoerl Aff. ¶¶ 30, 33.)

- **June/July 2002**: CCIC retained investment brokers to help secure capital investments. (Wilson Aff. ¶¶ 3, 5.) The investment brokers recommended that CCIC acquire Kaw Acquisition Corporation ("Kaw") to facilitate a reverse merger and attract the capital the Company needed. (Wilson Aff. ¶¶ 8–9.)

- **July 8, 2002**: CCIC requested that a $1 million dividend be paid to Delta. (Jackson Dep. Ex. 16.) In response to this dividend request, Betty Jackson ("Jackson") at the NCDOI reviewed CCIC's first quarter financial statement and supplemental filings. (Jackson Dep. Ex. 17.) Based on her review, she recommended that the NCDOI approve the request. (Jackson Dep. Ex. 17.)

- **July 16, 2002**: Dash Propes at the NCDOI expressed concerns about CCIC's surplus being "skinny for their writings and line of business." (Jackson Dep. Ex. 18.) However, Jackson's review and recommendation "did not suggest a skinny surplus," and she did think that the financial information indicated that the Company was near insolvency. (Jackson Dep. 167:1–6, 170:4–21.)

- **August 2, 2002**: CCIC filed its second quarter financial statement with the NCDOI. (Allen Aff. ¶ 22.) This quarterly statement revealed no material change in the Company's loss experience in California. (Allen Aff. ¶ 23.)

- **September 20, 2002**: A Stock Purchase Agreement memorialized an $8.5 million capital investment into Kaw. (Wilson Aff. ¶ 16.) Approximately $6 million of this investment would be injected into CCIC. (Wilson Aff. ¶ 11.) However, this investment transaction never transpired. (Haigh Aff. ¶ 60.)

- **October 8, 2002**: The NCDOI reviewed the premium rate adequacy of the California writings. (Evans Dep. Ex. 30.) Its review stated that "[i]t was abundantly clear . . . that the appropriate parties at CCIC are well aware of the risks inherent in their rapid growth" in California and that they have "been taking strong measures to deal with that risk." (Evans Dep. Ex. 30.)

- **October 9, 2002**: The CADOI approved an 8.45% rate increase in response to CCIC's June 2002 rate filing. (Giesecke Dep. Ex. 47.) However, in its rate filing application, CCIC had requested a 43.4% increase. (Hoerl Dep. Ex. 72.) The CADOI rejected the 90% loss ratio contained in the rate filing—a rate filing that Hoerl had prepared—and applied a 69% loss ratio instead.[13] (Hoerl Aff. ¶ 40.)

---

[13] The CADOI's loss ratio was similar to the loss ratios that CCIC's management had applied to the Company's 6/30/02 and 9/30/02 financial statements.

- **October 16, 2002**: Haigh and Giesecke met with potential investors in Los Angeles, California. (Haigh Aff. ¶ 60.) Their efforts to secure a capital investment were unsuccessful, and they left the meeting realizing that a capital investment would not occur by year end. (Haigh Aff. ¶ 60.)
- **November 1, 2002**: CCIC filed its third quarter financial statement with the NCDOI. (Allen Aff. ¶ 22.) This quarterly statement revealed no material change in CCIC's California loss experience. (Allen Aff. ¶ 23.)
- **November 18, 2002**: CCIC issued a formal underwriting bulletin announcing its decision to eliminate the carpentry construction class in California. (Haigh Aff. ¶ 68.) At that time, the carpentry construction class accounted for 35% of its California artisan business. (Haigh Aff. ¶ 70.) However, the overall loss ratios for the class had risen to approximately 103%, and CCIC drastically needed to restore its overall loss ratio to a more acceptable level. (Haigh Aff. ¶¶ 69–70.) CCIC eliminated the carpentry construction class in an effort to generate more policyholder surplus. (Haigh Aff. ¶¶ 69–70.) Ultimately, CCIC achieved a reduction in its California artisan premium volume—a reduction Haigh hoped would improve profitability. (Haigh Aff. ¶ 72.)

Table 4: California Artisan Premium Volume

| Month | Year | California Artisan Premium Volume |
|---|---|---|
| October | 2002 | $7.5 million |
| November | 2002 | $4.5 million |
| December | 2002 | $4.4 million |
| January | 2003 | $3.0 million |
| February | 2003 | $2.3 million |
| March | 2003 | $1.9 million |

SOURCE: Giesecke Dep. Ex. 77, 78.

- **November 19, 2002**:  Haigh notified his management team that CCIC had stopped writing new business in the Hudson artisan program in New York. (Haigh Aff. ¶ 137.)  This underwriting cutback was intended to slow the Company's growth and to improve its profitability.  (Haigh Aff. ¶ 137.)

- **December 16, 2002**:  CCIC's management team prepared a revised Operating Plan for 2002 and 2003 to outline the actions CCIC was taking to address the high written premium-to-surplus ratio.  (Haigh Aff. ¶ 70.)  CCIC had reduced writings and had "eliminated portions of the business where profitability was questionable."  (Giesecke Dep. Ex. 60 at 2.)  Management expected these changes to "make the remaining book of Artisan business significantly more profitable going forward."  (Giesecke Dep. Ex. 60 at 2.)

- **December 31, 2002**:  CCIC's policyholder surplus stood at $4.69 million.  (W. Custard Dep. Ex. 12.)  However, $475,358 was later added to the surplus due to net income after tax.  (W. Custard Dep. Ex. 12.)

- **January 16, 2003**:  Haigh continued discussions with potential investors but secured no real commitments.  (Haigh Aff. ¶ 139.)  The Company completed a preliminary year-end analysis for 2002 which showed a net statutory loss of approximately $1.4 million and a profit of $1 million.  (Haigh Aff. ¶ 139.)

- **February 1, 2003**:  CCIC's management eliminated all renewal business in the carpentry construction class of its California artisan business.  (Allen Aff. ¶ 57.)  This decision was intended to increase the Company's profitability and policyholder surplus.  (Allen Aff. ¶ 57.)

- **February 28, 2003**:  E&Y reviewed CCIC's loss and loss adjustment expense reserves and issued a statement of actuarial opinion ("February Opinion"). (W. Custard Dep. Ex. 11 at 1274.)  The February Opinion stated that the Company had *not* made a "reasonable provision in the aggregate for all unpaid losses and loss adjustment expenses."  (Ciardiello Dep. Ex. 8 at 4.) The February Opinion was based upon a significant change in the factors E&Y used to determine unpaid losses.  (Evans Dep. 141:2–16 & Ex. 6 at 2856–70.)

- **March 1, 2003**: CCIC filed its 2002 Annual Statement with the NCDOI. (W. Custard Dep. Ex. 1.) At the time of filing, management and E&Y did not agree on the reserve levels for 2002. (Allen Dep. 229:4–10.) E&Y believed management's reserve estimates were "several million dollars lower" than what was appropriate. (Haigh Aff. ¶ 144.) The reserve estimates that E&Y suggested were at a level that would trigger regulatory action under North Carolina's RBC requirements. (Haigh Aff. ¶ 144; *see generally supra* Part II.C.) E&Y relied on CCIC's California loss experience in calculating their reserve estimates for 2002—a fundamental change in their approach. (Haigh Dep. 1916:10–17.)

- **March 5, 2003**: CCIC terminated Haigh for cause from his officer and director positions with CCIC and Delta. (Haigh Aff. ¶ 160.) Mr. Custard blamed Haigh for the Company's losses. (Haigh Dep. 23:7–15.) According to Mrs. Custard, Haigh "made some bad business decisions" in 2001 and 2002. (W. Custard Dep. 50:16–17.) Specifically, she thought that "he grew the company too quickly." (W. Custard Dep. 52:14–17.) Upon termination, the Board of Directors appointed Mr. Custard to take Haigh's place as president and chief executive officer of the Company. (W. Custard Dep. Ex. 3.)

- **March 7, 2003**: The NCDOI placed CCIC under administrative supervision. (Wilson Aff. ¶ 26.) The Commissioner believed that CCIC was "in such condition as to render continuance of its business hazardous to the public or to the holders of its policies." (Blades Dep. Ex. 39 at 87.) Management maintained control of day-to-day operations, but certain transactions and expenses were subject to a supervision agreement. (Holloway Dep. 18:14–23, 22:13–16.) Burton Holloway, a NCDOI employee, served as CCIC's on-site supervisor. (Holloway Dep. 18:10–13.)

- **March 14, 2003**: Mr. Custard invested an additional $1 million of surplus into the Company and was "actively pursuing other surplus-enhancement steps." (Blades Dep. Ex. 39 at 86.)

- **March 24, 2003**:  Mr. Custard sent Haigh a letter which stated Mr. Custard would lose $7.6 million if CCIC went broke.  (W. Custard Dep. Ex. 7.)

- **April 14, 2003**:  CCIC filed an Amended 2002 Annual Statement with the NCDOI.  (W. Custard Dep. Ex. 11.)  The Amended Statement included a reissued actuarial opinion by E&Y.  (W. Custard Dep. Ex. 11 at 1.)  E&Y now opined that CCIC had made a "reasonable provision in the aggregate for all unpaid losses and loss adjustment expenses."  (W. Custard Dep. Ex. 11 at 4.)

- **April 15, 2003**:  CCIC submitted a RBC Plan to the NCDOI.  (W. Custard Dep. Ex. 12.)  The RBC Plan set out the steps management intended to take to overcome the financial difficulties the Company faced.  Due to the Company's diminished surplus, CCIC ceased writing new business.  (W. Custard Dep. Ex. 12 at 9.)

- **April 30, 2003**:  E&Y reissued its Reserve Study for CCIC's management and directors.  (Evans Dep. Ex. 6 at 2652.)  Although E&Y based its 2001 Reserve Study on the Company's non-California loss experience, E&Y based its 2002 Reserve Study entirely on the Company's loss experience in California.  (Evans Dep. 141:2–10.)  As a result, the 2002 Reserve Study presented substantially higher loss ratios estimates than the 2001 Reserve Study.  (Evans Dep. 139:5–11; *see also infra* App. D.)

- **June 30, 2003**:  CCIC stopped writing renewal business in accordance with its RBC Plan.  (W. Custard Dep. Ex. 12 at 7.)

- **November 17, 2003**:  CCIC was placed into rehabilitation.  From that point forward, the Commissioner of the Department of Insurance held title to all of the Company's assets and was responsible for running the day-to-day operations.  (Holloway Dep. 24:5–9.)

D.

{42}    Plaintiff identifies the commencement date of Defendants' capital-raising efforts as a material factual dispute.  Defendants stated in their Memorandum of Law in Support of their Motion that Haigh's efforts to secure outside capital began in June 2002.  (Defs.' Mem. Supp. Mot. Summ. J. at 18, 21.)  In contrast, Plaintiff

contends that Defendants' recapitalization efforts began in 2001. (Pl.'s Mem. Resp. Opp'n at 14, 21.) At the hearing, Defendants conceded this fact. As such, there is no need for a jury to resolve this discrepancy in the parties' submissions.

{43} Plaintiff also identifies the variance in the loss ratios used to prepare the Company's financial statements as a genuine factual dispute. However, according to the NCDOI's actuary, the Defendants' continued reliance on the non-California loss experience to prepare the Company's 2002 annual statement was reasonable. (Evans Dep. 35:19, 150:10–21.) The Court likewise finds the variance in the loss ratios to be a matter of methodology rather than a material factual dispute. *See infra* Part VII.F.

IV.

{44} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citation omitted). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist." N.C. R. Civ. P. 56 cmt.

{45} The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Courts must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976). The court should resolve any doubt

as to the merits of the motion by denying it. *See Volkman v. DP Assocs.*, 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980).

V.

{46} At the outset it is important to remember that although the development of the law of corporate governance has involved setting fundamental and clearly understandable standards of review for conduct of corporate officers and directors, each of those reviews is contextual. Different standards of review are used in different contexts, particularly where the function being exercised by the board is significant. This Court's explanation of the function of standards of review in *First Union Corp. v. SunTrust Banks, Inc.* bears repeating here:

> Professor Eisenberg has succinctly described the difference between standards of conduct and standards of review and their divergence in corporate governance:
>
> > A *standard of conduct* states how an actor should conduct a given activity or play a given role. A *standard of review* states the test a court should apply when it reviews an actor's conduct to determine whether to impose liability or grant injunctive relief.
> >
> > In many or most areas of the law, these two kinds of standards tend to be conflated.
> >
> > The conflation of standards of conduct and standards of review is so common that it is easy to overlook the fact that whether the two kinds of standards are or should be identical in any given area is a matter of prudential judgment. Perhaps standards of conduct and standards of review in corporate law would always be identical in a world in which information was perfect, the risk of liability for assuming a given corporate role was always commensurate with the incentives for assuming the role, and institutional considerations never required deference to a corporate organ. In the real world, however, these conditions seldom hold, and the standards of review in corporate law pervasively diverge from the standards of conduct. A byproduct of this divergence has been the development of a great number of standards of review in this area. In the past, the major standards of review have

included good faith, business judgment, prudence, negligence, gross negligence, waste, and fairness. An important new development has been the emergence of intermediate standards of review.

There are two main reasons why standards of review and standards of conduct have diverged in corporate law: fairness and efficiency. Both are related to needs of the corporate structure. The corporate structure requires competent directors willing to serve. In order to attract competent directors it is only fair that we judge their conduct according to the circumstances in which they must make decisions. Those circumstances include the fact that they often have to act without full information. They do not have control over the business environment that can affect the decisions they make. The business environment is constantly changing and courts, not as knowledgeable as businesswomen when it comes to operational business decisions, thus should defer to their business judgment. While we want to set high aspirational goals (standards of conduct) for directors, it is fundamentally fair to review their conduct on a less demanding level because of the circumstances in which they are called upon to act.

The efficiency argument relates to creation of corporate value or wealth. In order for the corporation to increase in value and thereby increase the wealth of its owners, it must take risks. If we discourage the directors who must make those risk decisions from being bold and creative by imposing a standard of review that is too onerous and creates too great a possibility of unacceptable liability, we defeat one of the very purposes for which corporations exist. Just as we limit the liability of those who contribute their financial capital to the enterprise, we must limit the liability of those who contribute their human capital (knowledge and judgment) in order to promote creation of value or wealth. Accordingly, where fairness and structural requirements dictate, standards of review have diverged from standards of conduct in corporate law. Significantly, when that divergence is permitted, the law recognizes that some legal duties may go unenforced.

Former Chancellor Allen has described the business judgment rule this way: "Closer to a description of the 'rule' that courts enforce, in the absence of a director conflict of interest, would be as follows: in the absence of a conflicting financial interest, a director will be liable for corporate losses caused by board action he authorizes, only if he has authorized such action without at that time having a good faith belief

that, in the circumstances present, he has satisfied his obligation to be reasonably informed."

Where fairness and structural requirements have not supported the need for standards of review to diverge from standards of conduct in corporate law, the two have tended to conflate. For example, where courts have applied a duty of loyalty as opposed to a duty of care, the standard of review has been more closely aligned with the duty standard. Directors in self-interested transactions are required to establish that the transaction was entirely fair to the corporation. The reasons are clear. In cases in which a director engages in a transaction with the corporation in which she has a personal interest, it is fair to apply a stricter standard of review. The director has more complete information since she is a party to the transaction and she has some control over it. It is fair to ask the director to simply prove that the manner in which the transaction in question is conducted is no different from the manner in which the same transaction would be conducted between the corporation and a third party on the open market. The question is not whether the decision was good or bad, only if it was the same as an open market transaction. That does not require the same kind of judicial expertise and does not call for the institutional deference that duty of care questions require. There is no structural incentive to reduce the director's potential liability, and there exists an incentive to require directors to be particularly careful when they engage in self-interested transactions with the corporation. In a self-interested transaction, the director is acting both on her own behalf and as the economic agent of the owner/shareholder.

In summary then, standards of review in corporate law diverge from standards of conduct when fairness and structural requirements dictate that such a divergence will promote corporate value or wealth creation. Where fairness and structural requirements do not support a divergence between the standard of review and the standard of conduct and thus do not promote corporate value, the two standards are more closely aligned or conflated. When conflation is present, legal duties are less likely to go unenforced.

Prior to the 1980s, when courts decided whether to apply a duty of loyalty to a particular fiduciary action, they were actually selecting a situation-specific process for reviewing that fiduciary action. If the duty of loyalty was applied, the review process included placing the burden on the fiduciary to justify the action on a market-specific basis. The fiduciary had to prove her action did not diminish corporate value. Application of the loyalty standard of conduct with its entire fairness

standard of review protected corporate value by prohibiting fiduciaries from taking unfair advantage of their position to transact business with the corporation at less than fair market value.

If the duty of loyalty standard of conduct was not applied or a duty of care standard of conduct was applied, the review process placed the burden of proof on the party challenging the fiduciary action. The fiduciary received the benefit of the business judgment rule with its divergent and less demanding standard of review. The less demanding standard of review process was selected because under the circumstances it best promoted corporate value by preventing judicial review under circumstances where that judicial review would deter director risk-taking. It reduced director risk of liability. A combination of the standard of review and placement of burden of proof can have a significant impact on final determination of an issue.

Standards of review serve other functions. They can serve as guideposts to alert businessmen to conduct that would trigger judicial intervention. They also serve as self-imposed restraints, limiting judicial intervention in the corporate process to those situations in which intervention can promote corporate value.

*First Union Corp. v. SunTrust Banks, Inc.*, 2001 NCBC 9A ¶¶ 22–30 (N.C. Super. Ct. Aug. 10, 2001), http://www.ncbusinesscourt.net/opinions/2001%20NCBC%2009A .pdf (citations and footnotes omitted).

{47} In the *First Union* case, this Court was called upon to apply a standard of review in the context of deal protection devices in a stock-for-stock merger subject to shareholder approval. A transaction was at the heart of the conduct being reviewed in that case. This case, however, involves the determination of the proper standard of review in two contexts: (1) the operation of the business and the application of the corporate charter's exculpatory provisions and (2) the director's duty to monitor. For purposes of this analysis, the determination of whether there was an absence of good faith or the existence of bad faith is virtually the same.

VI.

{48} North Carolina courts have frequently looked to the well-developed case law of corporate governance in Delaware for guidance. *First Union Corp. v. SunTrust Banks, Inc.*, 2001 NCBC 9A ¶ 32 (N.C. Super. Ct. Aug. 10, 2001),

http://www.ncbusinesscourt.net/opinions/2001%20NCBC%2009A.pdf. Given the number of issues raised in this case which have not been addressed by the North Carolina appellate courts, it is useful to look at the fiduciary duty cases in Delaware which deal with "good faith" and "bad faith." Fortunately, these cases have been collected and addressed in an article written by some of the leading experts and authors on Delaware corporate law. *See* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629 (2010). The article provides an in-depth analysis of the treatment of good faith under Delaware case law and focuses on the key analysis:

> The important work of substance, rather than rhetoric, is in defining principles that allow courts to fairly distinguish between two forms of director conduct: (1) conduct that involves a breach of the duty of loyalty and that should be remediable by an award of monetary damages, and (2) conduct that involves an exculpable or indemnifiable breach of the duty of care.

*Id.* at 634.

{49} That key analysis is central to this case because the corporate charter of CCIC contains an indemnity clause which exculpates director and officer action taken in good faith. (Haigh Aff. Ex. A at 7.) The indemnity clause provided:

> A director of the corporation shall not be personally liable to the corporation or its shareholders for monetary damages for breach of the duty of care or other duty as a director, except for liability (i) for any appropriation, in violation of the director's duties, of any business opportunity of the corporation, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) for the types of liability set forth in Section 14-2-154 of the Georgia Business Corporation Code,[14] or (iv) for any transaction from which the director derived an improper personal benefit.

(Haigh Aff. Ex. A at 7.)

{50} Actions not taken in good faith or taken in bad faith are not subject to exculpation. It is thus critical in this case to differentiate between the two forms of conduct and to determine the category into which Defendants' actions fall. Before

---

[14] Section 14-2-832 of the Georgia Business Corporation Code takes up liability for unlawful distributions and was formerly found in section 14-2-154. Ga. Code § 14-2-832 cmt. (2009).

getting started with that task, though, it is useful to look at several core principles underlying the analysis.

{51}   First, there is no duty of good faith separate and apart from the duties of care and loyalty under either Delaware or North Carolina law.  The article *Loyalty's Core Demand* makes it clear that the Delaware Supreme Court has backed away from the creation of a third fiduciary duty based solely on good faith.  In *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006), the Delaware Supreme Court clarified the waters previously muddied in *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), and held that the requirement that directors act in good faith was the core component of the duty of loyalty and not a separate fiduciary duty.  The North Carolina courts have not created a separate fiduciary duty of good faith because it is not necessary and would create significant uncertainty under our law.

{52}   Second, every analysis of fiduciary conduct is contextual in nature, and the contexts in which fiduciary duties are applied are constantly changing.  This second principle is clearly supported by the case law cited in *Robinson on North Carolina Corporation Law* directed to the question of whether different judgments might be made about director conduct in different industries or businesses.  Robinson cites to cases from the late 1800s which indicate that under North Carolina law a director of a bank might be held to a higher standard of care than a director of another business.  Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.03[1] (7th ed. 2009).

{53}   What is clear today is that the duties of a director of a behemoth bank such as Bank of America or Wells Fargo are vastly different from those of a local bank director in the late 1800s.  The context has changed, but the principle remains just as applicable.  Director obligations will be judged in the context in which they occur, and thus conduct by directors of an insurance company may be judged differently from conduct by directors of a textile company depending on the actions in question.  The guiding principle was succinctly stated by the Delaware Court of Chancery: "[N]o matter what our model [of corporate law], it must be flexible enough to recognize that the contours of a duty of loyalty will be affected by the specific factual

context in which it is claimed to arise . . . ." *TW Servs., Inc. v. SWT Acquisition Corp.*, Nos. 10427, 10298, 1989 Del. Ch. LEXIS 19, *28 n.14 (Del. Ch. Mar. 2, 1989).

{54} Third, in some context-specific applications of the duty of loyalty and care, both standards may be implicated. *See* Strine, Jr. et al., *supra*, at 638–39). One of these areas is the director's duties when disclosure is required.

{55} Fourth, the duty of loyalty is not limited to instances involving conflicts of interest. It also contains a component of affirmative action. Stated differently, there may be circumstances devoid of a conflict of interest in which the duty of loyalty requires a director to act. Under a duty of loyalty, a director is not only required to avoid conflicts of interest but also to (1) act in the best interests of those to whom a fiduciary duty is owed and (2) try in good faith to perform her duties with care.

{56} Fifth, the duty of loyalty is most difficult to apply in circumstances in which the director acts without an apparent selfish interest for injuring the corporation, most notably in circumstances alleging failure to properly monitor corporate activities. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

{57} Finally, although questions of motive and a director's state of mind may arise, the existence of those issues does not automatically preclude summary judgment. Concomitantly, there may be instances in which a director's or officer's motive or state of mind is a question for the jury.[15] This case, though, is not one of those instances. The Court has a significant gatekeeper role in determining which factual circumstances warrant submission of bad faith issues to a jury.

VII.

A.

{58} This case requires not only an understanding of basic concepts of insurance regulation but also a clear understanding of the role of "good faith" and

---

[15] Were the Court to hold that motive or state of mind are always jury questions, the litigation costs and burdens would deter rational business people from serving on boards and would add enormous unnecessary overhead to corporate budgets.

"bad faith" under the North Carolina law governing the fiduciary duties of corporate officers and directors. Little has been written about the role of good faith in fiduciary duty under North Carolina law. In fact, *Robinson on North Carolina Corporation Law* poses at least four unanswered questions about fiduciary duties of officers and directors which will be addressed in this opinion.[16] Fortunately, or unfortunately, much has been written about the role of good faith in the fiduciary law of Delaware.[17] For the reasons set forth below, the definitions of good faith and bad faith under Delaware law and their application by Delaware courts are useful tools for interpreting North Carolina law.

{59} The standard of care applicable to business decisions and business risks in North Carolina is set forth in section 55-8-30(a) of our General Statutes:

> A director shall discharge his duties as a director, including his duties as a member of a committee: (1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner he reasonably believes to be in the best interests of the corporation.

N.C. Gen. Stat. § 55-8-30(a)(1)–(3). That language requires the Court to look at the care (1) an ordinarily prudent person, (2) in a like position, (3) would exercise under similar circumstances, and (4) whether the officer or director acted in a manner he reasonably believed to be in the best interests of the corporation. That standard of conduct is subject to review under the business judgment rule.

{60} Although there is not an abundance of appellate guidance on application of the business judgment rule in North Carolina, it is clear that our courts do apply the rule. *See, e.g., Sec. Nat'l Bank v. Bridgers*, 207 N.C. 91, 176 S.E. 295 (1934); *Gordon v. Pendleton*, 202 N.C. 241, 162 S.E. 546 (1932); *State v. Harnett County*

---

[16] Is there a separate duty of good faith under North Carolina law? May different directors be held to different standards of care? May directors in different kinds of companies be held to different standards of care? Is the standard of review under the duty of care "negligence" or "gross negligence"? Robinson, II, *supra*, 14.03[1].

[17] Chancellor Chandler recently described the concept of good faith in Delaware as "[s]hrouded in the fog of . . . hazy jurisprudence." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 754 (Del. Ch. 2005). Another author asserts that Delaware courts have used "good faith" as a rhetorical cure to balance authority and accountability. *See* Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence*, 55 Duke L.J. 1 (2005).

*Trust Co.*, 192 N.C. 246, 134 S.E. 656 (1926); *Besseliew v. Brown*, 177 N.C. 65, 97 S.E. 743 (1919); *Anthony v. Jeffress*, 172 N.C. 378, 90 S.E. 414 (1916); *Braswell v. Pamlico Ins. & Banking Co.*, 159 N.C. 628, 75 S.E. 813 (1912). Robinson has described application of the rule as follows:

> The business judgment rule has been the subject of as much discussion and writing as any other single topic of state corporation law. Its terms and applicability have been defined by countless court decisions rather than by statute. It operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

Robinson, II, *supra*, §14.06 (footnotes omitted).

{61} Former Chancellor Allen of the Delaware Chancery Court has explained application of the business judgment rule in this way:

> What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a *good faith* effort to advance corporate interests. To employ a different rule—one that permitted an "objective" evaluation of the decision—would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions.

*In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967–68 (Del. Ch. 1996) (second emphasis added) (footnotes omitted).

{62}  Absent proof of bad faith, conflict of interest, or disloyalty, the business decisions of officers and directors will not be second-guessed if they are "the product of a rational process," and the officers and directors "availed themselves of all material and reasonably available information" and honestly believed they were acting in the best interest of the corporation. *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009) (citation and footnote omitted). The standard of review "is predicated on concepts of gross negligence." *Id.*

{63}  The CCIC corporate charter contains the following exculpatory provision:

> A director of the corporation shall not be personally liable to the corporation or its shareholders for monetary damages for breach of the duty of care or other duty as a director, except for liability (i) for any appropriation, in violation of the director's duties, of any business opportunity of the corporation, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) for the types of liability set forth in Section 14-2-154 of the Georgia Business Corporation Code,[18] or (iv) for any transaction from which the director derived an improper personal benefit.

(Haigh Aff. Ex. A at 7.)  To avoid the application of this exculpatory clause, Plaintiff must prove that the Company's officers and directors have not acted in good faith and that the same standard of review applies.  The directors are entitled to the same presumption of good faith.  To hold otherwise would require the Court to exercise the twenty-twenty hindsight forbidden by the business judgment rule.

{64}  Plaintiff's first prong of attack on its breach of fiduciary duty claim is based upon the business decisions made by Haigh during the period 2000 to 2003. Clearly, the decisions about what policies to write, what premiums to charge, and how much insurance to write without reinsurance are quintessential business judgments which determine the profitability and viability of an insurance company. Plaintiff may not overcome the exculpatory provisions by simply showing that the decisions were wrong, stupid, or egregiously dumb.  Proof that it would have been "more prudent" to write less coverage is insufficient to establish lack of good faith.

---

[18] Section 14-2-832 of the Georgia Business Corporation Code addresses liability for unlawful distributions and was formerly found in section 14-2-154.  Ga. Code § 14-2-832 cmt. (2009).

B.

{65}   Having abandoned his conflict of interest theory with respect to CIA, the Commissioner first asserts that Defendants should be subject to liability for breach of fiduciary duty based on business decisions made in connection with the volume of California artisan business.

{66}   With respect to Haigh, the Commissioner asks the Court to hold him directly liable for the poor business decisions he made.  The burden here is on the Commissioner to show that Haigh violated his duty of care when making the decisions he made as to the amount of artisan business CCIC wrote in California. The Commissioner must make some showing in that regard to overcome the presumption of the business judgment rule.  Presumably, Mr. Custard would be vicariously liable for those business decisions as CEO (even though it is clear that Haigh conducted CCIC's day-to-day operations).  Mr. Custard could also be held liable through his duty to monitor the business risks as a director.  Mrs. Custard's liability for the business decisions would presumably be based on her duty to monitor since it is clear that she had no role in day-to-day management.

{67}   Liquidation resulted from the business risks undertaken by CCIC in writing artisan insurance policies in California.  There is little doubt on this record that the premiums were set too low and too much business was written.  As the old adage says: "It is hard to make up for losses on volume."  CCIC either misjudged or mistimed the market.  Every individual Defendant concedes that the business decisions made were wrong.

{68}   In order to establish a lack of good faith in business decisions in the context of an insurance company, a plaintiff such as the Commissioner must show that the officers and/or directors displayed a conscious indifference to risks in the face of clear signals of the existence of problems likely to lead to insolvency.[19]  The review of the conduct is context-specific.  The insurance business is based on risks. As long as the process employed by the officers and directors was rational and they

---

[19] The Court deals with bad faith in connection with filing financial statements in Part VII.F.

believed they were advancing the corporation's business, the Court will not second-guess their business decisions—with a clear exception.

{69} Officers and directors of insurance companies have a duty to policyholders to act in such a manner as to avoid insolvency that would render the policies written worthless or substantially diminished in value. Where officers or directors of an insurance company intentionally fail to act in the face of a known duty to act to avoid insolvency, they have demonstrated a conscious disregard for their duties. Such conduct would amount to bad faith and would take the officers and directors outside the protection of the exculpatory provisions of a corporate charter.[20]

{70} For example, if officers and directors of an insurance company knew that the company was on the brink of insolvency or liquidation under RBC regulations and nonetheless adopted a go-for-broke strategy of writing excessive premiums in hopes of riding out the insolvency threat, such conduct would be a violation of their fiduciary duties. Such conduct would be imprudent given their position in the insurance company and their obligations to policyholders.

{71} In this case, there is no evidence of any irrational process. In addition to its in-house actuary, the Company also used outside actuarial experts. There is no evidence the business was run in any abnormal fashion. Efforts were made to increase rates, cut back on unprofitable lines, and raise capital. Management did write the wrong policies for the wrong premiums. Nonetheless, those decisions, whether right or wrong, were not made in any conscious effort to disregard their impact on the business.

{72} All the evidence supports a finding that Defendants were trying to run and build up a successful insurance company. The Custards stood to lose millions of dollars of their own money if the Company failed. Haigh stood to lose the value of his investment in Delta as well as his source of income. There were no excessive salaries or irrational bonus plans. Haigh's bonus was tied to income, not sales

---

[20] So, to answer one of Robinson's questions: Yes, directors in different kinds of companies can have different duties.

volume.  Moreover, all of Mr. Custard's correspondence was based on growing the Company.

{73}  The business was properly staffed with competent people.  The actors were not indifferent; they made judgments.  These judgments ultimately turned out to be wrong from a business standpoint, but no evidence suggests that the actors did not honestly believe that their decisions were in the Company's best interest.  There is no evidence that Defendants had any allegiance to any other goal, duty, or purpose.  There were no internal conflicts of interest, and the Court finds no evidence of bad motive.

{74}  The requirement of good faith on the part of officers and directors is a simple, straightforward requirement—an honest belief that (1) their actions are in the best interest of and not harmful to the corporation and (2) they have adequate information upon which to base their decisions.  The Commissioner has failed to produce evidence of a lack of good faith sufficient to overcome the presumption of good faith under the business judgment rule with respect to the business decisions made by Defendants.

C.

{75}  To the extent the Commissioner is relying upon a theory that the directors, particularly the Custards, breached their fiduciary duties by failing to oversee the market risk being taken by Haigh in writing CCIC's California artisan business, that theory also fails.

{76}  The standard of review for directors' duty to monitor was initially set forth in *Caremark* by Chancellor Allen:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.

*In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).

{77} The *Caremark* standard has been reemphasized recently by both the Delaware Supreme Court in *Stone v. Ritter*, 911 A.2d 362, 364–65 (Del. 2006), and the Delaware Chancery Court in *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 122 (Del. Ch. 2009). In *Stone v. Ritter*, the Delaware Supreme Court reiterated *Caremark*'s holding that a showing of bad faith conduct is essential to establish director oversight liability. *Stone*, 911 A.2d at 370. The Delaware Supreme Court said:

> *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Id.*

{78} In *Citigroup*, Chancellor Chandler summarized the required proof of failure to monitor as follows:

> Thus, to establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act. The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to director oversight liability.

*Citigroup*, 964 A.2d at 123. This Court believes that North Carolina courts will follow similar standards of review with respect to the monitoring duties of directors.

{79} The recent holding of the Delaware Court of Chancery in *Citigroup* is particularly instructive in that it deals with the directors' duties to oversee market risks. In that stockholder derivative action, plaintiffs alleged that the officers and directors of Citigroup breached their fiduciary duties by failing to oversee and

manage the corporation's subprime lending market risks.[21]  *Id.* at 111.  Although the decision turned on a demand futility pleading analysis, it articulated the standard of conduct to be applied when the directors are alleged to have failed to monitor business risk:

> [P]laintiffs' theory essentially amounts to a claim that the director defendants should be personally liable to the Company because they failed to fully recognize the risk posed by subprime securities. . . . [W]hat is left appears to be plaintiff shareholders attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company.

*Id.* at 124.

{80}  The Court concluded that the claims implicated not only a *Caremark* standard of review of directors' duty of oversight,[22] but also the interrelationship between the presumption of the business judgment rule and the exculpatory provision in the Citigroup charter.  *Id.* at 125.  The Court, in essence, applied virtually the same standard of review for the *Caremark* claims and the claims purportedly falling into a non-exculpatory category.  The Court held that the plaintiffs were required to plead bad faith conduct by "alleging with particularity that a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties."  *Id.*

{81}  This action rests at the summary judgment stage.  We have more than pleadings to rely upon in judging the directors' conduct.  The claims in this case and the claims pled in *Citigroup* summon the same appropriate standards of review.  The Commissioner must meet either the *Caremark* standard to establish a failure to monitor or the bad faith standard to overcome the exculpatory provision in CCIC's corporate charter addressing violations of the duty of care.  The bar for both rests at a high level.  *See id.*

{82}  There is no evidence that the directors of CCIC acted in bad faith in monitoring business risks.  Haigh was experienced and had an experienced staff.

---

[21] Numerous other claims were alleged but not relevant here.

[22] *See supra* ¶ 76.

He used outside actuaries to assess CCIC's risks, and the NCDOI accepted their methodology. The business was showing a profit, albeit a small one.

{83} There were only two red flags that might have caused the directors to question what was happening. First, there was Hoerl's assessment that the California losses might be bigger than expected. However, no evidence indicates that the Custards were aware of Hoerl's assessment, and even if they had known, they were entitled to rely on E&Y's analysis. Second, there was some evidence that the volume of business being written was at some point running ahead of surplus. However, Haigh was working to find new capital and the Company was exiting non-profitable business, reinsuring portions of its business, and seeking rate increases—all steps designed to address the shortfall. Plus, in the fall of 2002, the Company made significant additions to its loss reserves.

{84} In this context, the Commissioner has failed to establish that any director had the illicit state of mind sufficient to support a finding of bad faith in the monitoring context. There is no showing of a conscious disregard of red flags. There is no showing of actual knowledge that the business was failing. There is no showing of reckless indifference, improper motive, personal advantage, or deliberate disregard of corporate interests. The Custards stood to lose millions of dollars from such conduct. The Company was complying with all its filing requirements. It did not fall into any violation of the RBC requirements until 2003, and that event was triggered by the increase in losses resulting from reevaluation of the claims in the Las Vegas office of CIA and the change in loss analysis methodology by E&Y. The Court, therefore, concludes that there is no evidence to support submitting an issue of bad faith failure to monitor to a jury.

D.

{85} The Commissioner has urged the Court to read *State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 513 S.E.2d 812 (1999), as establishing a cause of action for negligent mismanagement of an insurance company. The Court declines to give that decision such a broad interpretation for a number of reasons. For one, in *ILA* the Court specifically declined to address the issue of a duty of an insurance

company officer or director to a policyholder because, as in this case, the Commissioner brought suit on behalf of the company. *Id.* at 592, 513 S.E.2d at 816. For another, the defendant in *ILA* was liable because he had a conflict of interest, breached his fiduciary duty, and caused damage to the company.[23] *Id.* at 602–03, 513 S.E.2d at 822. The court in *ILA* made no holding that the defendant would be liable for negligent mismanagement if he had not breached his fiduciary duty and was not, therefore, entitled to protection of the business judgment rule. The court did not treat the negligence claim as an independent cause of action.

{86} The problem arises from the language of one sentence in the opinion which reads: "plaintiff has standing to bring suit against defendant for breach of fiduciary duty *and negligent mismanagement.*" *Id.* at 593, 513 S.E.2d at 817 (emphasis added). However, the decision is clearly based on a determination that defendant breached his fiduciary duties as a corporate officer and director and that his breach caused the damages found by the trial court. The court said: "The evidence in the record reveals that defendant's actions were more than mere errors in judgment. Instead, he was a leading participant in a plan to benefit himself and his interests at the expense of ILA." *Id.* at 602, 513 S.E.2d at 822. The court held that such conduct abrogated the application of the business judgment rule because he acted in his own self interest, not in the best interest of the corporation and, thus, in bad faith. *Id.* Accordingly, he was held responsible for his actions which caused damage to the corporation, and the corporation was entitled to recover those damages which inured to the benefit of the policyholders. *Id.* at 604, 513 S.E.2d at 823. Not having the benefit of the gross negligence standard of review, the director's conduct was subject to a negligence standard of review under the statute.

{87} In the case before this court, there has been no showing of a conflict of interest or breach of fiduciary duty of loyalty. The *ILA* decision should not be read to create a stand-alone cause of action for negligent mismanagement. To do so would void the statutory scheme for fiduciary liability set forth in section 55-8-30 of

---

[23] When determining liability, the court in *ILA* also considered the fact that the director defendant "did not reasonably rely on advice from professionals." *Id.* at 604, 513 S.E.2d at 823.

the North Carolina General Statutes and the common law application of the business judgment rule, and there is no language in the *ILA* opinion to support such a sweeping interpretation. Judge Edmunds correctly applied the statute and the business judgment rule. He did not create a new, freestanding cause of action for negligent mismanagement. The decision simply held that a director who is not entitled to the protection of the business judgment rule can be liable for negligent conduct which harms the corporation.

E.

{88}   In responding to duty of care claims, it is not uncommon for directors to assert their reliance on outside advisors as a defense. *See* N.C. Gen. Stat. § 55-8-30(b). The rationale for this statutory safe harbor is "the growing complexity of business affairs" which makes it "necessary for directors to rely on other corporate personnel" and "outside experts in discharging their responsibilities." *See* Robinson, II, *supra*, § 14.05.

{89}   This safe harbor is disquieting at a time when the reliance on computer models of risk by financial institutions proved so disastrous for the economy. What we considered to be quantitative information turned out to have a significant and ignored qualitative aspect. Perhaps we need more qualts and fewer quants. Computer models may contain mathematical wizardry but be devoid of common sense. *See Number-Crunchers Crunched: The Uses and Abuses of Mathematical Models*, Economist, Feb. 13, 2010 (Special Report), at 5, 8. In one sense, the safe harbor here is disquieting because, had E&Y used a different judgment in 2002 in assessing CCIC's risk from its California artisan business, CCIC might never have gotten into trouble. It would have been slowed down by a higher claim rate. In this case, the statute provides protection to the directors because they relied on E&Y's judgment and expertise in assessing CCIC's potential liabilities.

{90}   With respect to reliance on E&Y's analysis, it is important to look at the statutory language of section 55-8-30(b)(2). It requires the director to reasonably believe the work being done by the outside advisor is "within their professional or expert competence." § 55-8-30(b)(2). In this case, there is no evidence that any

director had any reason to believe that E&Y did not possess the technical expertise to do the work. E&Y's 2002 report is thorough, comprehensive, and performed by fully qualified professionals. Its decision to use non-California data was based upon a facially logical determination that it was better practice to use more mature data than immature California data alone. The NCDOI knew about the decision and did not disagree with the methodology. There is no evidence in this record that E&Y was not competent to perform the actuarial work relied upon. In fact, all evidence is to the contrary.

{91} The Custards not only relied on E&Y, they also relied on Haigh. Haigh, who was the principal manager of CCIC at the time, agreed with E&Y that use of non-California data was more appropriate. Allen, the CFO, also supported E&Y's analysis.[24] Under the statute, the Custards are entitled to rely on the judgment of both Haigh and Allen. Section 55-8-30(b) provides that a director "is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by one or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented." § 55-8-30(b)(1). There is no evidence before the Court to suggest that the Custards' belief that Haigh and Allen were reliable and competent in these matters was unreasonable.

{92} Although subparts (b)(1) and (b)(2) of section 55-8-30 protect directors who reasonably rely on officers, employees, and outside experts, a director will not be relieved of responsibility if she does not follow or ignores the advice provided. *See State ex rel. Long v. ILA*, 132 N.C. App. 587, 603, 513 S.E.2d 812, 822 (1999). It is not enough to get advice; it must be followed. In addition, a director cannot rely on a report if she has actual knowledge that it is inaccurate. In this case, the only evidence tending to show lack of reasonable reliance was Hoerl's differing view of how the California losses would develop. But he was not a certified actuary, and his opinion was considered and rejected by E&Y. His views were not hidden or ignored. E&Y simply came to a different judgment—a judgment upon which the individual

---

[24] Plaintiff never accused Allen of any wrongful conduct.

Defendants relied. While Haigh's conduct is subject to a closer review because he had Hoerl's views to consider, he was still entitled to rely on E&Y's judgment in the risk analysis.[25]

{93}  In conclusion, the safe harbor provided by section 55-8-30(b) of the North Carolina General Statutes remains applicable. The Commissioner has not produced sufficient evidence to overcome its presumptions. The statutory language provides strong support for Defendants' position that they exercised their duty of care in good faith. There is no evidence that Defendants are not entitled to its protections.

F.

{94}  Finally, the Court addresses the Commissioner's arguments that the individual Defendants breached their fiduciary duties by filing misleading financial reports with the NCDOI sometime in the last half of 2002.

{95}  If the Company's directors had adopted a go-for-broke or gambling-for-resurrection strategy, they would have violated their fiduciary duties. However, the Commissioner does not argue or offer proof that they adopted such a strategy. If the officers and directors had knowingly filed false or misleading reports with the NCDOI, they would have violated their fiduciary duties. However, there is no evidence that they knowingly took such action. If the directors had consciously disregarded their duty to oversee the companies' filing requirements, they would have violated their fiduciary duties. However, there is no evidence of a conscious disregard of those duties.

{96}  In carrying out their fiduciary duties to ensure that their company's submissions to the regulatory authorities are correct, corporate officers and directors must have a good faith belief that the submissions are correct. A good faith belief must be an informed belief.

{97}  In addition, corporate directors have a duty to conduct lawful activities. As the *Loyalty's Core Demand* article points out, corporations are chartered to only perform legal acts. Strine, Jr. et al., *supra*, at 652 & n.69. An illegal act would be

---

[25] To answer another of Robinson's questions: Yes, different directors may be subject to differing duties, at least based on their knowledge.

outside the scope of activities authorized by a corporate charter. To knowingly cause a "corporation to engage in unlawful acts" or unlawful business practices is disloyalty "in the most fundamental of senses." *Id.* at 650. When directors of an insurance company *knowingly* acquiesce in the filing of false financial reports with a regulatory agency, they are being disloyal to the company's essential purpose and have breached their fiduciary duty. *See id.* Complying with the law (e.g. honest regulatory filings) "comes ahead of profit-seeking" in the insurance industry, "and directors owe a duty of loyalty to that hierarchy" of corporate obligations in their supervision of corporate affairs. *Id.* at 651.

{98} The RBC regulatory structure is based upon a public policy to control risks associated with insurance. Officers and directors of insurance companies know the importance of the need for strict compliance with the regulatory scheme to protect policyholders in the event of insolvency by the insurer. The obligation to comply with the regulatory requirements lies at the core of the business. Directors of insurance companies have a fiduciary duty—under both a duty of care and a duty of loyalty—to exercise good faith in the supervision of the regulatory filings which protect policyholders as well as the owners of the company. Officers responsible for the regulatory filings have a fiduciary duty to see that the filings are accurate, in compliance with regulations, and not misleading. The duties of directors are monitoring duties, whereas the duties of officers are duties of care.

{99} At the center of this motion for summary judgment is the question of whether Plaintiff has produced sufficient evidence to get to the jury on the issue of whether the officers and directors violated their fiduciary duties with respect to the regulatory filings. The Court concludes that the evidence is insufficient under the applicable standards of review.

{100} The only evidence in this record that CCIC was "going for broke" or "gambling for resurrection" is the large increase in premiums written in 2002 after the brokers expressed reservations at the end of 2001. After 2001, CCIC took steps to reduce the amount of premiums written. There is no evidence that it adapted a go-for-broke strategy or that it had a belief that its methodology for setting reserves

would be reversed by E&Y in 2003. Deliberately adopting a gambling-for-resurrection strategy in the context of an insurance company would be a breach of fiduciary duty. However, that was not the case here.

{101} The Commissioner may argue that the existence of the spike in business written in 2002 is sufficient to infer a go-for-broke strategy. However, there is no evidence that the increase in premiums was affirmatively generated for purposes of gambling on an outcome. Here, the Custards had a $6 million investment at CCIC which would have been put at significant risk by a go-for-broke strategy. Mr. Custard's admonitions to Haigh were to make the business more profitable, not to go for broke. Moreover, Mr. Custard's investment of $1 million in the Company in 2003 is entirely inconsistent with a go-for-broke strategy. CCIC also had taken steps to reduce the premiums being written. It had expanded reinsurance, raised rates, reduced its exposure in certain markets, and attempted to raise capital. All those actions contradict a go-for-broke strategy.

{102} With respect to financial reporting, officers and directors owe a fiduciary duty to exercise good faith in submitting financial information to the NCDOI. It matters little whether that good faith obligation is contained in a duty of care or a duty of loyalty. Nor is it significant for this decision whether that duty was owed to policyholders or the corporation. The "good faith" determination would be the same.

{103} Similar to Delaware law, North Carolina law does not contain a third separate duty of good faith. Rather, the requirement of good faith is found in the statute[26] and is the core concept embodied in the requirement of loyalty.

{104} What then is "good faith" as embodied in these fiduciary duties? Good faith requires that officers and directors have a loyal state of mind: that is, a justifiable, honestly held belief that they are acting in the best interests of the corporation, whether they are making operating decisions or monitoring certain aspects of corporate functions. In that sense, motive becomes a significant factor, and one never far from the minds of those charged with reviewing corporate conduct. Neither errors in judgments nor negligence establish bad motive.

---

[26] N.C. Gen. Stat. § 55-8-30.

{105} The issues surrounding the filing of monthly reports with the NCDOI raise different questions than those related to the decisions regarding what volume of business the Company would write. At the risk of repetition, the Court finds the following facts to be undisputed and controlling with respect to the determination of Defendants' alleged bad faith in connection with the filing of monthly financial reports with the NCDOI.

{106} CCIC did not misstate and has not been accused of misstating any material information on its financial statement other than its loss reserves. It is not accused of overstating assets or understating any other liability. All of the other information it provided in its financial statements to the NCDOI remain unchallenged.

{107} When it received a claim, CCIC would set up a case reserve consisting of both an indemnity portion (what will be owed to the claimant) and allocated loss adjustment expenses ("ALAE") (the cost to administratively handle the claim). Every claim was assigned to the year in which the loss occurred, without regard to when it was actually paid. Loss reserves are set by accident year.

{108} CCIC's historical or incurred losses consisted of the indemnity and ALAE payments previously made, plus case reserves for future indemnity and ALAE payments to be made in the future. The latter reserves changed as new payments were made, whereas the former remained constant.

{109} During the period at issue, CIA's Las Vegas office set the loss reserves for open California artisan insurance claims. For some period of time, CIA used a "step reserve" approach which undervalued CCIC's California artisan claims.[27] In the fourth quarter of 2002, management realized the extent to which the claims had been under-reserved and that case reserves had to be increased substantially.

{110} In addition to past or historical claims, CCIC was required by the NCDOI to periodically estimate its additional future losses for each accident year. These

---

[27] Under the "step reserve" approach, CIA adjusters "would increasingly add to the expense reserves over the life of the claim rather than trying to predict at claim inception the total expenses which would be incurred over the life of the claim." (Reed Aff. ¶ 27.)

future losses are incurred but not reported reserves ("IBNRs"). IBNRs consist of two components. The first is an estimate of increases to the reserves that exist for claims already received, and the second is a reserve for future claims that have not been reported but will be assigned to that accident year.

{111} Because IBNRs are an unknown, they must be estimated in some manner. The estimates are prepared by actuaries. They look at past data to try to predict the future. In addition to the Company's in-house actuary, CCIC also retained an outside firm to provide actuarial services.

{112} Actuaries take the historical data and purely mathematical calculations based on known growth in losses and then select appropriate cumulative loss development facts ("CDFs") to project what they believe will be the ultimate losses for an accident year. (*See, e.g.*, Hoerl Dep. Ex. 58 at 1813.) The actuaries then use other methods in combination with the method just described to come up with a selected ultimate loss and ultimate loss ratio for each accident year. (*See, e.g.*, Hoerl Dep. Ex. 58 at 1841, cols. 8–9.) It is important to note here that the selected loss ratio is not a purely mathematical calculation or extension of numbers in the sense of multiplication or division. The actuary applies judgment. That judgment depends in large part on the amount and quality of historical data.

{113} The loss ratio is then combined with CCIC's expense ratio to determine if the business written in a particular year on a particular line of business is profitable. While an insurance company may compensate for small underwriting losses by making a profit on its investments, it is the management's ability to determine the right premium to generate underwriting gains that is critical to success. *See supra* ¶ 12 n.3.

{114} Returning to the ultimate loss selection, it becomes clear that the more data the actuary possesses, the more refined and, hopefully, more accurate her calculations. For simplicity's sake, take an example of accident years in 2000 and 1996. An actuary evaluating losses in 2001 would have far more data to use in evaluating 1996 losses than 2000 losses. It is from historical data that the actuary makes her judgments on how losses will grow for a particular accident year.

{115} How the ultimate losses are determined impacts the reserves required by the NCDOI under its RBC formulas. The higher the projected ultimate loss, the greater the reserve required. CCIC's failure to meet its reserve requirements triggered the Commissioner's actions. The failure to meet the requirements resulted in part from a change in 2003 by E&Y in its methodology for calculating CCIC's losses in its California artisan business.

{116} It is that change which is at the heart of the Commissioner's bad faith breach of fiduciary claim based upon CCIC's regulatory filings. To some extent it also impacts the good faith issues associated with the amount of premiums written.

{117} It is undisputed that in April 2002, when its loss reserves for 2001 and prior years were set, Haigh, Allen, and Hoerl believed that CCIC's historical data for its California artisan business was not reliable from both a quantity and quality standpoint. Hoerl believed the data showed losses of greater magnitude in California than non-California artisan policies but agreed that E&Y's use of non-California data with more and better historical data was actuarially sound. E&Y was an outside firm and made its judgment to use non-California data independent of CCIC's management. E&Y had Hoerl's information available when it did so.

{118} At that time the NCDOI found nothing wrong with E&Y's judgment in using non-California data to set the loss selection amount for California artisan losses because of the immaturity of the California data. The Court finds that decision to be rational and understandable, but with twenty-twenty hindsight, probably an error. It certainly was not a red flag which raised or should have raised concern on the part of CCIC management.

{119} The Court digresses here to address Plaintiff's argument that CCIC used different loss calculations when seeking a rate increase for its artisan policies in California in the summer of 2002.[28] First, it is clear that E&Y had the same information. Second, CCIC was trying to get a rate increase in California in 2002; using more California data, even though immature, to get that rate increase was

---

[28] Hoerl used an estimated loss ratio of 93.8% for the California artisan line for all years compared to the 76.4% he had developed internally using different CDFs.

not a sign of bad faith. The application was a public document, and no deception was being practiced. Hoerl used different CDFs for the rate increase than were used to calculate reserves for RBC purposes. The CADOI did not accept his CDFs.

{120} Hoerl did an internal actuarial analysis of ultimate losses on February 7, 2002.[29] He concluded from his analysis that the California data showed a steeper and more rapid development pattern than the non-California artisan book, and he brought that conclusion to the attention of management. On February 28, 2002, CCIC filed its annual statement with the NCDOI which showed a loss ratio of 67.2% for 2000 and 56.3% for 2001. (Hoerl Dep. Ex. 54 at 2.)

{121} Returning to the E&Y April 30, 2002 report, it is clear that E&Y supported Haigh and Allen's view that it was more reliable to use non-California historical data to determine projected ultimate losses than the short history in California. The E&Y report contained the following provisions in its "Reliance & Limitations" section:

> The projection of ultimate loss and LAE reserves are estimates of future events, the outcomes of which are unknown at this time. Considerable uncertainty and variability are inherent in the estimation of loss reserves. As a result, it is possible that actual experience may be different than the estimates promulgated in this report, and such difference may be material. As such, we cannot guarantee that future experience will be as expected in this report or recorded by the Companies.
>
> . . . .
>
> Our estimates of ultimate losses are based on historical loss development experience of the Companies, supplemented with an Ernst & Young study of industry development patterns based on U.S. Annual Statement Schedule P data as published in *Best's Aggregates and Averages (1999)*. In using this historical information we assumed that past loss development is predictive of future development.

(Haigh Dep. Ex. 38 at 3.)

{122} The same section points out that E&Y relied on the financial information given to it by Allen, the CFO. There is no allegation that the information was

---

[29] Hoerl used a loss ratio of 79.7% in this analysis. (Hoerl Dep. Ex. 8 at 1.)

inaccurate, and no claims have been made against Allen. It is clear that E&Y made a judgment to use selected LDFs from non-California data which were lower than the data for California would indicate based upon the limited information available. It also appears that the use of the lower numbers can compound the error in ultimate loss reserves because of their use in a cumulative development pattern. Furthermore, it appears that the decision to use non-California numbers applied to all the other methodologies used by E&Y to test the ultimate loss determination. In the end, E&Y used an average ultimate loss ratio of 62.5%. That number was lower than any number Hoerl had used because E&Y gave less or little weight to the actual California numbers. It was a judgment call, and it supported Haigh and Allen's views on how the losses would develop.

{123} There is nothing in this record to indicate that E&Y did not act totally independent of CCIC management or exercise its best judgment. In fact, the E&Y analysis was reviewed by an actuary in the NCDOI. The NCDOI actuary reported to his supervisor: "I concur in all respects with the findings and conclusions of [E&Y's] opining actuary and his associate with respect to the loss and LAE reserves of CCIC at 12/31/01. The methods they employed were appropriate and properly used. The assumptions and judgments made were reasonable and the conclusions sound." (Evans Dep. Ex. 2 at 27241.)

{124} The Commissioner points to the rate filing dated June 21, 2002, as some evidence of either CCIC's fraud in filing its reports with the NCDOI or its obligation to amend or change E&Y's selection of LDFs in determining its ultimate losses. In that rate filing *based on the same December 31, 2001 numbers used by E&Y*, Hoerl exercised his judgment to use different data than E&Y. Instead of using only historical non-California data, Hoerl used a database including the California data that resulted in significantly higher LDFs. The only evidence of record as to why he chose the LDFs he used is that (1) he was being as aggressive as possible to get the highest rate increase which would lower CCIC's ultimate loss ratio and (2) he believed the California losses would develop differently.

{125} Hoerl deserves credit for his assessment of how the California losses would develop. History has confirmed his views. However, the now-proven fact that he was right does not establish bad faith on the part of Haigh or CCIC's management or directors. Several points are worth noting. First, E&Y's opining actuary, Gary T. Ciardiello, was an accredited actuary; Hoerl was not. Our statutes protect management from error based on reliance upon experts.[30] CCIC management had a strong incentive to follow the expert guidance, in addition to the fact it believed the guidance was correct.[31] Second, Hoerl had a business motive—obtaining a rate increase—to use the different LDFs. E&Y's task in its study was to see that reserves were set by a reasonable method. Most significantly, the CADOI rejected Hoerl's numbers, reducing his loss ratio from 88.7% to 69.6%.

{126} To summarize, there is nothing in this record to indicate that CCIC's use of the loss ratios recommended by E&Y based on the 2001 numbers was an act of bad faith, or even negligent. The rate increase filing in June 2002 does not change that conclusion in any way for the reasons set forth above.

{127} The issue then moves to what, if anything, triggered an obligation on the part of CCIC management to change the loss ratio on an interim basis before the next annual E&Y analysis. The Commissioner contends that the June 30, 2002 and September 20, 2002 quarterly reports were false and misleading because the loss ratios were not changed in light of the 2002 developments.[32]

{128} During 2002, CCIC made changes to its underwriting policies which management believed would improve performance. CCIC received a rate increase in 2001. Then, in 2002, CCIC received another rate increase, although not as much as requested. CCIC also added reserve strength to its loss reserves for accident years prior to 2002. Those additions were apparent in the financial statements filed with the NCDOI. By September 30, 2002, CCIC had added over $5.5 million to the reserves for years prior to 2002.

---

[30] It is not difficult to imagine a different scenario in which management would have been held liable for ignoring an expert report and relying on a non-accredited employee actuary.
[31] The NCDOI also relied on the expert.
[32] CCIC filed monthly reports, but both parties have focused on the June and September reports.

{129} Management's belief that the underwriting changes were having a positive effect on 2002 losses is reflected in the direct ultimate loss ratio reported to the NCDOI in the June 30 quarterly statement that was filed in August. CCIC used a loss ratio of 53% for its California artisan losses. Hoerl's internal projection was actually lower. He used a loss ratio of 51.5%. The June 30 filing did not differ substantially from the E&Y Reserve Study. It reflected management's belief and Hoerl's belief that loss ratios were better for the 2002 book of business.

{130} Following that filing, CCIC heard back from the CADOI on its June rate increase request. That response came in late September 2002. The CADOI used a loss ratio of 69.6%. So at the end of September 2002, management's judgment, the E&Y's analysis, and the CADOI's judgment all were reasonably aligned. The loss ratio CCIC used in its June rate increase request is an outlier. As noted above, CCIC made significant increases to its loss reserves for years prior to 2002 and increased its loss ratio on California artisan business to 70.5%, virtually the same as the 69.6% used by the CADOI on September 25, 2002.

{131} The Court will not go into great detail regarding the 2001 California rate increase request and the E&Y 2001 analysis. Suffice it to say that there was an even greater disparity between the loss ratio used in the 2001 rate request and the loss ratio used in the E&Y analysis. Despite that difference, the Commissioner has not challenged the E&Y loss ratio for 2001. Such an omission again demonstrates that the 2002 California rate filing request is not evidence of bad faith or fraud on the part of CCIC's management.

{132} It is critical to look at the elements that caused CCIC's financial status to change so drastically. Three factors in particular caused CCIC's loss reserves to skyrocket, placing the Company in the risk category for NCDOI action in 2003. First, the actual reported losses on California artisan insurance increased over historical loss projections. Second, CCIC made massive additions to its reserves in the fourth quarter of 2002 as the result of a previous underestimation of claims by the Las Vegas office of CIA which handled the California artisan claims. Third, E&Y changed its methodology for calculating loss reserves to focus solely on the

California numbers and no longer used nationwide historical numbers. The combination of all three factors resulted in an average 100% increase in loss reserves for all years.

{133} The fact that actual losses were higher than previously projected does not establish bad faith. Setting premiums to cover losses is what insurance companies do every day. If the premiums are too high, the company loses business. If the premiums are too low, the company incurs losses on the premiums written.

{134} The substantial increase in reserves for open claims resulting from the mistakes in the Las Vegas adjustment office had a compounding impact. It increased the actual reserve for open claims by almost $9 million. That larger number was then used to determine the known growth in losses, causing a higher loss ratio. It clearly impacted the CDFs and E&Y's decision to use actual California data instead of nationwide historical data when setting reserves in 2003. The numbers were too dramatic to ignore.

{135} The Commissioner has provided no evidence that CCIC management either orchestrated or was aware of the problems in CIA's Las Vegas office. To the contrary, the record establishes that management increased the reserves in the last quarter of 2002 to reflect the new information it received when management of the Las Vegas office changed. Again, no indicia of bad faith or improper motive are attributable to CCIC management.

{136} The change which had the most dramatic impact was unmistakably E&Y's decision to forgo use of nationwide historical data (which it had used in 2002) and use solely California data to determine ultimate losses on the California artisan policies. Table 5 below shows the magnitude of change between E&Y's 2002 Reserve Study and its 2003 Reserve Study.[33] *See also infra* App. D.

---

[33] The percentages are derived from a chart used by Defendants' counsel at oral argument. The numbers were not challenged by the Commissioner.

Table 5:  E&Y Reserve Study Comparison

| Accident Year | E&Y 2001 Reserve Study | E&Y 2002 Reserve Study | Percent Increase |
|---|---|---|---|
| 1999 | 98.0% | 136.4% | 39.2% |
| 2000 | 56.7% | 117.1% | 106.5% |
| 2001 | 55.8% | 122.7% | 119.9% |
| All-Year Total (1999–2001) | 62.0% | 122.8% | 98.1% |

SOURCE: Hoerl Dep. Ex. 58 at 1856; Evans Dep. Ex. 6 at 2856.

{137} The explanation for the change is apparent from the uncontradicted facts. The decision on what data to use was a judgment call.  No one has second-guessed the 2002 judgment of E&Y.  Then, in 2003, E&Y changed its judgment because the historical data on California was more mature.  It was certainly more robust in that actual losses had far exceeded projections, thus impacting the judgment on growth patterns.  CCIC had already added $12.5 million to the reserves for 2000 and 2001 before E&Y began its 2003 work.

{138} As a result of the significant reserve strengthening that took place in the latter part of 2002, E&Y chose to change the CDFs it used.  This change increased the required reserves for ultimate losses, and CCIC failed to meet the applicable risk-based standards.  The Court will not delve deeply into the numbers because it is abundantly clear that the change in judgment by E&Y caused a significant enough change in the required reserves to lead the Commissioner to the action he ultimately and rightly took.  Defendants did not act in bad faith in failing to change the loss reserves prior to E&Y's change in its method of calculation.

{139} History teaches us at least three things.  First, our knowledge is vulnerable.  What we think we know with certainty can and probably will be proven wrong.  Second, things will change.  Third, bad things will happen, randomly.[34]

---

[34] *See generally* Nassim Nicholas Taleb, *Fooled by Randomness: The Hidden Role of Chance in Life and in the Markets* (2004).

{140} E&Y acknowledged the vulnerability of its "knowledge" and that things could change. Its report stated:

> The projection of ultimate loss and LAE reserves are estimates of future events, the outcomes of which are unknown at this time. Considerable uncertainty and variability are inherent in the estimation of loss reserves. As a result, it is possible that actual experience may be different than the estimates promulgated in this report, and such difference may be material. As such, we cannot guarantee that future experience will be as expected in this report or recorded by the Companies.

(Haigh Dep. Ex. 38 at 3.) Things did change, and they changed for the worst.

{141} The judgment made by E&Y, Haigh, and Allen was not an absolute worst case scenario calculation. California losses turned out to be much worse than projected and much worse than losses on comparable policies in other states. It highlights the dilemma faced by many financial planners. Planning and estimating for the worst case scenario is conservative, avoids all risk, limits business opportunity, and is costly.[35] *See supra* ¶¶ 12–13.

{142} In the insurance industry, RBC plans are designed to invoke intervention before the worst case scenario arises, but they are no guarantee against it. Instead, they are a compromise dictated by economic reality. That is why many states, like North Carolina, have guaranty funds paid for by insurance companies. *See supra* ¶ 17 n.6.

VIII.

{143} The Commissioner's Memorandum raises three specific areas in which the Commissioner asserts there are disputed facts preventing summary judgment. The Court will address each separately. However, the disputes either do not exist or are immaterial to the outcome of this decision. In particular, the California rate actions and the Kaw transaction would not appear to be the cause of any damage the

---

[35] It is worth noting that it was not until after the banking crisis hit that the U.S. Treasury actually did a worst case scenario analysis and changed the capital requirements of the country's financial institutions.

Commissioner seeks to recover. Even if the funds were in dispute, they would not be material to the outcome.

## A.

{144} The Court finds that there is not a material credibility issue with respect to Haigh's testimony about his reservation over the adequacy of CCIC's reserves. Those statements related to his belief after February 2003 when E&Y took the position that the reserves were not adequately stated. They did not relate to his beliefs about the adequacy of the reserves in 2002 when both he and E&Y used a different methodology to calculate the reserves for losses. In any event, if Haigh had reservations in 2002, these reservations were unknown to the Custards.

{145} Despite the corrections Haigh made to his 2006 testimony,[36] Plaintiff still maintains that Haigh harbored doubts about the reserve liabilities which kept him from moving forward with a capital transaction. (Pl.'s Mem. Resp. & Opp'n at 24.) The evidence before the Court, however, suggests otherwise.

{146} In June 2002, CCIC received notice that AM Best would downgrade its solvency rating if the Company did not secure an outside capital investment. For several months thereafter, Haigh worked with a team of investment and legal professionals to raise capital through a reverse merger transaction. (Haigh Aff. ¶ 110.) On September 30, 2002, Haigh and Wilson executed a Letter of Commitment which indicated that a capital infusion would be forthcoming. (Haigh Dep. Ex. 270.) During the negotiations that followed, Haigh reassured the investor that CCIC was "ready to commit the necessary time, capital and other required resources to close a mutually beneficial transaction." (Haigh Dep. Ex. 69.) Although the negotiations ultimately reached an impasse (*see* Haigh Aff. ¶ 141), the Court views Haigh's efforts during this time as steps towards a capital transaction.

## B.

{147} To the extent Plaintiff raises an issue regarding the lawfulness of CCIC's rate actions in California, the Court declines to deny Defendants' Motion on this

---

[36] At his March 2006 deposition, Haigh had not yet been served with the lawsuit. Therefore, he did not retain counsel and did not spend significant time in preparation. (Haigh Aff. ¶¶ 150–52.)

ground.  The CADOI examined the Company's rating and underwriting practices and decided not to cite CCIC for any violations of section 790.03 of the California Insurance Code.  (O'Connell Dep. Ex. 9.)  The decision as to liability and whether to impose penalties under section 790.03 rests with the Insurance Commissioner of California.  Cal. Ins. Code § 790.035 (West 2009).

{148}  Furthermore, the California rate actions do not create a genuine issue of material fact with respect to Defendants' knowledge of the Company's profitability in California.  CCIC's management realized that its California artisan business was less profitable than its non-California artisan business.  (Hoerl Dep. Ex. 54.)  The question of whether Defendants appropriately responded to this realization has already been addressed.

C.

{149} Plaintiff further contends that Defendants' attempts to structure a capital investment into Kaw constitute self-dealing and a violation of section 58-7-200 of the North Carolina General Statutes.  According to Plaintiff, in July and August of 2002, CCIC disbursed company funds to purchase shares of Kaw for the personal benefit of Haigh and Mr. Custard.  (Pl.'s Mem. Resp. & Opp'n at 20, 42.)  Plaintiff claims that this transaction violated North Carolina insurance laws because CCIC "invested in" its directors, officers, and controlling shareholders.  The evidence before the Court, however, does not support a claim brought under a theory of self-dealing or under section 58-7-200 of the North Carolina General Statutes.

{150}  Defendants were trying to secure an outside capital investment into Kaw so that CCIC could maintain its A- rating.  (Wilson Aff. ¶¶ 3, 5.)  A reverse merger transaction through a public shell company, like Kaw, provided a realistic avenue for raising capital.  (Wilson Aff. ¶¶ 7–8.)  Any increases in shareholder value that Haigh or Mr. Custard could have personally realized as a result would have been predicated on a growth in the Company's profitability.  Although a self-dealing theory may be appropriate in certain situations where a director derives a personal benefit from a transaction at the expense of the corporation, we are faced with no such situation in the present case.

{151} Plaintiff also argues that CCIC's disbursements to Delta support a claim for self-dealing and violate section 58-7-200. (Pl.'s Mem. Resp. & Opp'n at 43.) However, the Court views these disbursements as one of the steps the Company took to raise outside capital, not as evidence of self-dealing.

IX.

A.

{152} On August 13, 2003, Haigh entered into a Settlement Agreement with CCIC. (Holloway Dep. Ex. 19.) The Settlement Agreement provided that CCIC would make certain payments to Haigh: $50,000 at the time of execution, ten monthly payments of $10,000 each thereafter, and a $7,874.63 reimbursement for the business expenses he incurred as President. (Holloway Dep. Ex. 19.) CCIC also agreed to release Haigh from any and all liabilities arising out of his Employment Agreement. (Holloway Dep. Ex. 19.) In return for the release and payments, Haigh agreed to waive any and all claims he may have had against the Company under the terms of his Employment Agreement, including his claims to a thirty-day notice of termination and a three-year severance payout. (Holloway Dep. Ex. 12, 19.)

{153} When the parties executed the Settlement Agreement, CCIC was under administrative supervision. (Patterson Aff. ¶ 3.) During a period of administrative supervision, North Carolina insurance laws require the insurer to "comply with the lawful requirements of the Commissioner." N.C. Gen. Stat. § 58-30-60(d). In this case, the Commissioner issued a Summary Order that required CCIC to obtain written approval from the Commissioner prior to engaging in certain transactions. (Blades Dep. Ex. 39.) The Commissioner's list of regulated transactions included, but was not limited to, the following: conveying or disposing of assets, transferring property, withdrawing from bank accounts, making payments to company officers or directors, and incurring any debt, obligation, or liability. (Blades Dep. Ex. 39.)

{154} The Commissioner appointed one of his deputy commissioners ("Oglesby") to carry out the provisions of the Summary Order. (Blades Dep. Ex. 39.) Oglesby then designated the Department's Chief Forensic Accountant ("Holloway") as the

Company's on-site supervisor and primary contact. (Holloway Dep. 18:12–13 & Ex. 7.) As on-site supervisor, Holloway was responsible for reviewing transactions and approving expenses that were subject to the Commissioner's supervision. (Holloway Dep. 18:16–23.) Therefore, CCIC consulted with Holloway on numerous occasions when negotiating the payments at issue. (Holloway Dep. Ex. 8–11, 13–14, 16–18.)

{155} On May 6, 2003, the NCDOI pre-approved CCIC's Settlement Agreement with Haigh. (Holloway Dep. Ex. 15.) The Department conditioned its approval on the understanding that there would be no guarantee of continued payments if the Company moved into rehabilitation or liquidation. (Holloway Dep. 95:1–2 & Ex. 15; Holloway Aff. ¶ 9.) Further negotiations took place during the drafting process, but eventually the parties executed the Settlement Agreement—an agreement whose terms and contents received NCDOI approval. (Patterson Aff. ¶ 9; Holloway Dep. 121:1–4.)

{156} From August 13, 2003 until November 4, 2003, Haigh received payments under the terms of the Settlement Agreement. (Haigh Aff. ¶ 170.) However, those payments stopped when CCIC was placed into rehabilitation on November 17, 2003. (Haigh Aff. ¶ 170; Trendel Aff. ¶¶ 4–5.) At that point, the Commissioner, in his capacity as rehabilitator, disavowed the Settlement Agreement under section 58-30-120(a)(11) of the North Carolina General Statutes. (Oglesby Aff. ¶ 12.) The Commissioner now seeks to recover the payments Haigh received while CCIC was under administrative supervision.

B.

{157} Prior to discovery, Haigh moved for summary judgment on all claims asserted against him in the Amended Complaint. In support of his motion, he relied on the Commissioner's Verified Petition for an Order of Rehabilitation and the Affidavit of William S. Patterson, a financial examiner at the NCDOI. This Court denied the motion at that time based on the limited factual record.

{158} Shortly thereafter, discovery commenced. After approximately twenty-one months of discovery, Defendants jointly filed a motion for summary judgment on all claims. Their motion included the claims on which Haigh had moved for summary

judgment in his previous motion. Plaintiff contends that Defendants' Motion is improper given the Court's 2007 Order denying Haigh's earlier motion. The Court disagrees.

{159} It is well-established in our jurisprudence that "where one judge denies a motion for summary judgment, another judge may not reconsider . . . summary judgment on the same issue." *Cail v. Cerwin*, 185 N.C. App. 176, 182, 648 S.E.2d 510, 515 (2007) (citation omitted). However, as our case law illustrates, this rule only applies in the two-judge context. *See, e.g., id.*; *Hastings v. Seegars Fence Co.*, 128 N.C. App. 166, 493 S.E.2d 782 (1997); *Huffaker v. Holley*, 111 N.C. App. 914, 433 S.E.2d 474 (1993); *Whitley's Elec. Serv., Inc. v. Walston*, 105 N.C. App. 609, 414 S.E.2d 47 (1992); *Smithwick v. Crutchfield*, 87 N.C. App. 374, 361 S.E.2d 111 (1987). A judge is "clearly within his rights in vacating" his own summary judgment order, for "[s]uch procedure does not involve one judge overruling another." *See Carr v. Great Lakes Carbon Corp.*, 49 N.C. App. 631, 635, 272 S.E.2d 374, 377 (1980), *rev. denied*, 302 N.C. 217, 276 S.E.2d 914 (1981); *Miller v. Miller*, 34 N.C. App. 209, 212, 237 S.E.2d 552, 555 (1977).

{160} The Court rejects Plaintiff's suggestion that "the first judge himself may not change his mind and overrule his own order." *See Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131 (2d Cir. 1956) (Hand, J.). In the subpart below, the Court will consider whether the record now before it warrants summary judgment on Plaintiff's third claim for relief, which seeks to recover the settlement payments CCIC made to Haigh in the months prior to rehabilitation.

C.

{161} Once a rehabilitation order has been entered, the receiver appointed under such order may recover (on the insurer's behalf) certain pre-rehabilitation payments. Specifically, section 58-19-60(a) of the North Carolina General Statutes allows the receiver to recover payments made to a director or officer as part of a termination settlement. N.C. Gen. Stat. § 58-19-60(a)(i). However, this recovery provision is not without limitation. For one, it only applies to payments made in the year preceding the petition for rehabilitation. § 58-19-60(a). For another, it

excludes payments that were lawful and reasonable when paid if "the insurer did not know and could not reasonably have known that such [payments] might adversely affect [its] ability . . . to fulfill its contractual obligations." § 58-19-60(b).

{162} Plaintiff, in his capacity as receiver, now seeks to recover the settlement payments Haigh already received. (Am. Compl. ¶¶ 85–88.) Neither side disputes that CCIC made the termination payments within one year of rehabilitation. (Pl.'s Mem. Resp. & Opp'n at 48.) The evidence before the Court, though, establishes that (1) the payments were lawful and reasonable when paid and (2) the Company did not and could not have known that such payments might hinder their ability to fulfill their contractual obligations. Therefore, the limitation of subpart (b) of section 58-19-60 bars Plaintiff's recovery.

{163} CCIC and Haigh negotiated at arm's length. The Company terminated Haigh for cause. (W. Custard Dep. Ex. 7.) Mr. Custard blamed Haigh for CCIC's financial downfall and stood to lose millions of dollars on account of Haigh's alleged mismanagement. (W. Custard Dep. Ex. 7.) Haigh had fallen into disfavor and was not in a position to receive a sweetheart deal.

{164} When settlements talks began, CCIC refused to accept Haigh's initial proposal for a $300,000 lump sum payment. (Holloway Dep. Ex. 10.) Instead, it countered and eventually worked its way down to $150,000 to be paid out over the course of ten months with no guarantee of continued payments in the event of rehabilitation or liquidation. (Holloway Dep. Ex. 11, 15, 17.) Given the liabilities that loomed on both sides had the parties not reached a settlement, the Court believes the parties reached a fair compromise.

{165} In addition, the Department approved the settlement payments during a time of active supervision. (Holloway Dep. 128:7–17.) Administrative supervision is a regulatory tool designed "to protect the interests of policyholders, claimants, creditors, and the public generally" through "early detection of any potentially dangerous condition in an insurer." § 58-30-1(c)(1). When the parties executed the Settlement Agreement, the Department viewed the payments as lawful, fair, and reasonable. (Holloway Dep. 111:5–12, 129:25, 130:1–20.) When its view changed,

the Department stopped making payments. (Holloway Dep. 134:11–25, 135:1–2.) Therefore, in effect, the negotiated right to terminate payments in the event of rehabilitation or liquidation safeguarded CCIC from any future payments that may have hindered its ability to fulfill its contractual obligations.

{166} For these reasons, the Court GRANTS Defendants' motion with respect to Plaintiff's third claim for relief. The Commissioner may not recover the termination payments Haigh received while the Company was under the Department's watch.

D.

{167} In its Memorandum in Response and Opposition to Defendants' Motion for Summary Judgment, Plaintiff argues that the settlement payments were a voidable preference under section 58-30-150 of the North Carolina General Statutes.[37] Section 58-30-150(a) defines a "preference" as:

> a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the insurer within one year before the filing of a successful petition for liquidation under this Article, the effect of which transfer may be to enable the creditor to obtain a greater percentage of this debt than another creditor of the same class would receive.

Despite its newfound reliance on North Carolina's voidable preference provision, Plaintiff never questions the continued applicability of section 58-19-60. Instead, Plaintiff merely impugns the strength of Defendants' factual support. (Pl.'s Mem. Resp. & Opp'n at 48.) For the reasons stated in subpart (c), the Court already determined that the evidence before it supports summary judgment on Plaintiff's recovery claim under section 58-19-60(b). Nonetheless, the Court will consider what effect, if any, section 58-30-150 may have on its prior determination.

{168} Where "two statutory provisions conflict, one of which is specific or 'particular' and the other 'general,' the more specific statute controls in resolving any apparent conflict." *Furr v. Noland*, 103 N.C. App. 279, 281, 404 S.E.2d 885, 886

---

[37] Plaintiff first raised its voidable preference argument in response to Defendants' Motion for Summary Judgment. Plaintiff's third claim for relief, however, only sought recovery based on violations of section 58-19-60. Given this shift in theory, the Court will address the interplay between sections 58-19-60 and 58-30-150 of the North Carolina General Statutes.

(1991) (internal quotations and citation omitted). Plaintiff brings the interplay of two North Carolina insurance laws to the Court's attention: the voidable preference provision[38] and the recovery provision.[39] These two provisions present a potential for ambiguity in that a liquidator could interpret certain transfers as avoidable under the former while at the same time interpret those same transfers as nonrecoverable under the latter.

{169} The Court resolves any ambiguity between these two provisions in favor of the specific and particular language set forth in section 58-19-60. Although under section 58-30-150 a liquidator may avoid "a transfer of any of the property," section 58-19-60 specifically identifies payments "in the form of a termination settlement" as being within its scope. *Compare* § 58-30-150(a) *with* § 58-19-60. The "transfers" at issue in this case were in the form of a termination settlement. Section 58-19-60, therefore, controls, and the determination set forth in subpart (c) remains in effect.

CONCLUSION

{170} In April 2002, E&Y selected the LDFs used to set CCIC's reserve levels. It used historical "rest of country" data rather than actual California data to do so. This selection was a judgment call, and one with which Haigh and Allen agreed. Evans, an actuary with the NCDOI, reviewed the E&Y Reserve Study in May 2002, and advised his supervisor that the selections made by the opining actuary at E&Y evidenced good judgment and were free from bias. He had no recommendations for approaching loss development selections differently.

{171} In the third and fourth quarters of 2002, the Company's California losses for the previous years accelerated, and errors in CIA's Las Vegas office resulted in large increases to the reserves for actual claims made. With that new knowledge, E&Y changed its methodology for calculating the LDFs and CDFs used to project ultimate losses. The new projections placed CCIC at risk from a capital standpoint and resulted in the NCDOI liquidating the Company.

---

[38] N.C. Gen. Stat. § 58-30-150.
[39] N.C. Gen. Stat. § 58-19-60.

{172} The NCDOI does not fault E&Y for its methodology in 2002 or 2003. Yet it asks the Court to impose liability for breach of fiduciary duty on CCIC's officers and directors for employing the same methodologies. Plaintiff faults Defendants for not realizing that the California losses would develop more aggressively and for failing to change their loss development approach sooner. Based on the record before the Court, however, it is clear that the information that drove E&Y's change in methods did not surface until the third and fourth quarter of 2002, and by then the damage was already done. E&Y's subjective judgment on what factors to use was driven by the new information, and application of the math dictated the ultimate loss reserve number which triggered liquidation.

{173} It is readily apparently that from 1999 to sometime in 2002, CCIC's management failed in its primary business task: the premiums selected were too low to cover the losses on the policies written, and too many policies were written on the mistaken assumption of what the losses would be. Those decisions were quintessential business decisions that are made everyday by insurance industry managers. They are subject to the business judgment rule, and Plaintiff has failed to adduce evidence of bad faith on the part of the officers or directors of CCIC which would void the indemnification provision in CCIC's corporate charter.

{174} Filing false or misleading financial statements with the NCDOI would constitute bad faith on the part of officers and directors of an insurance company. The standard for bad faith in this context requires either scienter or an officer or director acting with such a conscious disregard of the duty to report accurate information that it makes such conduct culpable. Here, it is undisputed that the officers and directors relied on an independent actuarial opinion in setting the reserve estimates it reported to the NCDOI. This outside expert used his own professional judgment to apply historical non-California information when selecting his LDFs and did not change that judgment until the year-end numbers for 2002 came in which demonstrated the error in that judgment. CCIC's management made a significant increase in its loss reserves in the second half of 2002 in response to the changes in the actual claim losses. The outside expert's failure to convert to use

of all California numbers before the 2003 audit has not been shown to be the product of fraud or a conscious disregard of a duty to act.

{175} Our recent economic downturn is a stark reminder that computer models of risk are not always accurate and reliance on them can prove disastrous. The entire regulatory scheme and our statutes encourage use of and reliance upon experts and their computer models. Whether that is a good policy is debatable following our recent economic crisis. Nonetheless, it was the policy in effect during the period at issue and is still supported by statute. There is no evidence that CCIC's officers and directors knew, should have known, or consciously disregarded information that E&Y's methodology was wrong, or that E&Y would change its methodology for determining CCIC's ultimate losses or what that change would be if it occurred.

{176} Bad faith giving rise to personal liability may be found, at a minimum, under the following circumstances, depending on the context:

    (a) Taking or approving action which, though legal, the Courts find to be inequitable;[40]

    (b) Taking or approving action which is not in the best interest of the corporation in order to advance a personal interest, either financial or nonfinancial, in nature;[41]

    (c) Knowingly taking or approving action which violates the law[42] and exposes the corporation to liability or other forms of harm;

    (d) A sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system[43] or deliberate, conscious, or intentional disregard of duty; or

    (e) A failure of the directors of an insurance company to exercise adequate oversight to ensure that the company's filings with the appropriate

---

[40] *See Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).
[41] *See* N.C. Gen. Stat. § 55-8-30.
[42] *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005).
[43] *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996).

regulatory agency charged with overseeing its solvency were in compliance with regulatory requirements.

{177} In a derivative action, a plaintiff seeking to hold insurance company directors liable for bad faith and/or a failure to monitor corporate activity must adduce facts which tend to establish that the directors acted in such a manner that their conduct falls into one of the categories described above. Only then would the burden shift to the directors to establish that their conduct was undertaken in good faith and with proper motives. Such a standard of review implements the goal of *Caremark* to relieve directors of having to prove that corporate cataclysms had not resulted from their negligence without some prima facie evidence of bad faith on the part of the directors. The Commissioner has failed to establish a breach of fiduciary duty by Defendants. This case involves only breaches of the duty of care that are exculpable and/or indemnifiable. The Commissioner has failed to establish evidence of bad faith that would support an award of monetary damages.

{178} Therefore, based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED, this the 19th day of March, 2010.

APPENDIX A

On October 22, 2001, Hoerl prepared an internal loss reserve analysis comparing the Company's 2001 losses (through September) to the 2000 year-end losses. (Allen Dep. 145:3–6.) This analysis focused on CCIC's California artisan business. (Hoerl Dep. 88:13–16.) In his executive summary, Hoerl observed that the changes in the non-California book of business had been "small" whereas the changes in the California artisan business had been "substantial." (Hoerl Dep. Ex. 7 at 1.) His results for the ultimate loss and ALAE loss ratios illustrate this finding.

Table 6:  Estimated Loss Ratios – Hoerl

|        | Non-California Book of Business | | California Artisan Business | |
|--------|---------------------|----------------------|---------------------|----------------------|
|        | As of December 2000 | As of September 2001 | As of December 2000 | As of September 2001 |
| Direct | 47.7%               | 49.3%                | 46.3%               | 76.4%                |
| Net    | 44.4%               | 44.3%                | 35.8%               | 73.6%                |
| Ceded  | 53.0%               | 55.7%                | 60.7%               | 79.5%                |

SOURCE: Hoerl Dep. Ex. 7 at 1.

These results strongly suggested that the Company's loss development pattern in California would be different. (Hoerl Dep. 92:16–21.) The direct loss ratios for CCIC's California artisan business increased from 46.3% to 76.4% in nine months. (Hoerl Dep. Ex. 7 at 1.) However, the non-California book of business only increased from 47.7% to 49.3% during that same time period. (Hoerl Dep. Ex. 7 at 1.)

Hoerl's analysis also revealed a growth in earned premium. As of September 2001, the direct earned premium of CCIC's California artisan business ($28 million) accounted for a large portion of the Company's total book of business ($49 million). (Hoerl Dep. Ex. 7 at 1.) This growth in premium, like the loss estimates, "suggested the possibility of a more aggressive development pattern" in California losses. (Hoerl Dep. Ex. 7 at 1.)

APPENDIX B

Hoerl prepared an initial loss reserve analysis based on the Company's 2001 year-end loss data. (Hoerl Aff. ¶ 16.) This analysis was reviewed by management when making selections for the 2001 annual statement. (Hoerl Dep. 108:12–16.) Hoerl found that CCIC's California loss experience had "deteriorated significantly." (Hoerl Aff. ¶ 22.) A comparison of the year-end results illustrates this finding.

Table 7: Loss Ratios for Artisan Direct – Hoerl

| Accident Year | California Artisan Business | |
| --- | --- | --- |
| | Final Reserve Analysis for 2000 Annual Statement | Initial Reserve Analysis for 2001 Annual Statement |
| 1999 | 60.7% | 108.6% |
| 2000 | 40.0% | 82.1% |
| 2001 | | Not Revealed |
| All-Year Total | 46.2% | 79.7% |

SOURCE: Hoerl Aff. ¶ 16; Hoerl Dep. Ex. 8 at 1434.

The ultimate loss and ALAE ratio estimates for CCIC's California artisan business increased from 46.2% in 2000 to 79.7% in 2001. (Hoerl Dep. Ex. 8 at 1.) This increase suggested that the Company's California artisan business would not be as profitable as Hoerl initially had predicted in his 2000 Reserve Analysis. (Hoerl Dep. 112:1–17.)

Hoerl based his 2001 analysis on the assumption that the California artisan business and the non-California book of business "each represented about a 50% influence on the Company's combined loss development factors." (Hoerl Dep. Ex. 8 at 1.) However, as the loss pattern in California developed, Hoerl began to have concerns that this "credibility-weighted approach . . . might be understating the actual losses in CCIC's California artisan program." (Hoerl Aff. ¶ 9.)

APPENDIX C

E&Y prepared an independent actuarial analysis of CCIC's 2001 year-end losses. (Hoerl Aff. ¶ 21.) The E&Y Reserve Study was based upon the same data that Hoerl analyzed in his internal review; nevertheless, E&Y reached a different conclusion. (Hoerl Dep. 407:11–17.) E&Y reported that CCIC's loss experience in California was "largely unchanged." (Hoerl Dep. Ex. 58 at 20.) In contrast, Hoerl had reported that the California losses were deteriorating. (Hoerl Dep. 416:9–25.) According to Hoerl, neither analysis was right or wrong, just a difference of opinion. (Hoerl Dep. 413:19–22.) The E&Y Reserve Study also recognized this variability when addressing the limitations of its analysis: "[c]onsiderable uncertainty and variability are inherent in the estimation of loss reserves." (Hoerl Dep. Ex. 58 at 3.)

Unlike Hoerl, E&Y gave no weight to CCIC's loss experience in California. (Allen Aff. ¶ 20.) Instead, E&Y based its loss estimates entirely on the Company's non-California loss experience. (Allen Aff. ¶ 20.) Ultimately, the senior consulting actuary at E&Y concluded that the losses management booked to the 2001 annual statement were "reasonable" and met applicable requirements of North Carolina insurance laws. (Hoerl Dep. Ex. 57 at 3.) Although Hoerl disagreed with E&Y's loss estimates, he recognized the reasonableness of management giving more weight to E&Y's estimates because their actuary held more accreditations. (Hoerl Aff. ¶ 21.)

Table 8: Comparison of 2001 Loss Ratio Estimates for Artisan Direct

| Accident Year | California Artisan Business | | |
| --- | --- | --- | --- |
| | 2001 Reserve Analysis (Hoerl) | 2001 Reserve Analysis (E&Y) | 2001 Annual Statement (Management) |
| 1999 | 108.6% | 98.0% | Not Revealed |
| 2000 | 82.1% | 56.7% | 63.2% |
| 2001 | Not Revealed | 55.8% | 56.3% |
| All Years | 79.7% | 62.5% | Not Revealed |

SOURCE: Hoerl Aff. ¶ 22.

APPENDIX D

Although E&Y based its 2001 Reserve Study on CCIC's non-California loss experience, it based its 2002 Reserve Study entirely on CCIC's California loss experience. (Evans Dep. 141:2–10.) As a result, the 2002 Reserve Study presented substantially higher loss ratios estimates than the 2001 Reserve Study. (Evans Dep. 139:5–11.) A comparison of the year-end results illustrates this finding.

Table 9: Loss Ratio Estimates for California Artisan Business

| Accident Year | E&Y 2001 Reserve Study | E&Y 2002 Reserve Study |
|---|---|---|
| 1999 | 98.0% | 136.4% |
| 2000 | 56.7% | 117.1% |
| 2001 | 55.8% | 122.7% |
| 2002 | | 79.2% |
| All-Year Total (1999–2001) | 62.0% | 122.8% |
| All-Year Total (1999–2002) | | 100.5% |

SOURCE: Hoerl Dep. Ex. 58 at 1856; Evans Dep. Ex. 6 at 2856.

In the 2002 Reserve Study, the loss ratio estimates for 2000 and 2001 more than doubled. For Accident Year 2000, E&Y's loss ratios increased by 106.5% and for Accident Year 2001, E&Y's loss ratios increased by 119.9%.

From one year to the next, E&Y's gross ultimate loss and ALAE estimate increased by $23.2 million (63%). (Evans Dep. Ex. 6 at 23–24.) The net ultimate loss and ALAE estimate increased by $10.1 million (51%). (Evans Dep. Ex. 6 at 24.) These dramatic increases were primarily due to worse than expected development in accident years 2000 and 2001. Once the historical losses in California came in, E&Y realized that it would no longer be appropriate to rely on non-California LDFs.